[No. 15366-8-I.   Division One.   April 20, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. MICHAEL E. BAREFIELD, *Appellant.*

*Michael Filipovic* of *Seattle–King County Public Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michael DiJulio, Deputy,* for respondent.

WEBSTER, J.—Appellant George Meskuotis[1] appeals from the judgment and sentence entered on a jury's verdict finding him guilty of negligent homicide (former RCW 46.61-.520). Meskuotis maintains that the trial court erred (1) by admitting evidence of blood alcohol tests without first requiring an adequate foundation, (2) by failing to require jury unanimity regarding the mode of committing the offense, and (3) by admitting into evidence a gruesome photograph of the accident scene. He further contends that the judge should have dismissed his conviction at his sen-

---

[1] During his arrest and trial George Meskuotis used the alias "Michael E. Barefield."

tencing hearing because, prior to sentencing, he was unlaw-fully detained in federal penitentiary in violation of the Interstate Agreement on Detainers (the IAD). We affirm.

FACTS RELATING TO NEGLIGENT HOMICIDE

On July 6, 1979, Meskuotis was involved in a 2–car traffic accident on Highway 169 in Maple Valley. The person riding with Meskuotis and the driver of the second car were killed. No one saw the accident. Meskuotis was charged with two counts of negligent homicide.

Testimony at trial showed that the accident had been caused by Meskuotis' Volkswagen pickup. One of the troopers who investigated at the scene of the accident testified that, judging from the tire marks, scuff marks, and gouge marks, the pickup had crossed the center line and had collided with the approaching car, a Volkswagen Rabbit. Another trooper testified that the Volkswagen Rabbit was knocked backward and lifted up into the air by the Volkswagen pickup.

Meskuotis testified that, at the time of the accident, he was not driving the Volkswagen pickup, but was asleep on the passenger side. However, one of the troopers testified that, on impact, Meskuotis had not been ejected as far as the other person in the Volkswagen pickup. Meskuotis was found approximately 7 feet from the point of impact; the other person was found approximately 47 feet from the point of impact. The trooper concluded, therefore, that Meskuotis was the driver of the Volkswagen pickup because the driver's path, at impact, would have been impeded by the steering wheel and, consequently, the driver would not have been ejected as far as the passenger. Another trooper testified that, judging from the mangled floor pedals on the driver's side of the vehicle, the driver would have experienced serious leg injury. Meskuotis sustained severe lacerations and fractured both ankles. From this evidence it was determined that Meskuotis had been the driver.

Meskuotis admitted that on the day of the accident he had been drinking. At approximately 6:30 p.m. he had

stopped at his passenger's house where he had consumed two to three beers as well as two drinks of orange juice mixed with "Everclear", which, according to Meskuotis, is 180 proof grain alcohol. A trooper at the accident scene testified that Meskuotis smelled strongly of alcohol. Blood tests run at the hospital after the accident indicated that Meskuotis' blood alcohol level was .18 percent.[2]

When evidence of Meskuotis' blood alcohol level was admitted at trial, defense counsel objected on the following grounds: (1) the officer failed to advise Meskuotis of his right to have additional blood tests; (2) the State failed to show that the test tube was free from adulteration; and (3) no blank test was performed. Defense counsel also objected to admission of a photograph of the accident scene in which the victim in the Volkswagen Rabbit was pictured in the crunched vehicle with blood on his arm. Finally, the defense requested jury instructions requiring unanimity concerning the mode of committing the offense. The request was denied.

On December 29, 1979, the jury found Meskuotis guilty of both counts of negligent homicide. However, Meskuotis failed to appear for sentencing, having apparently left the state. On May 17, 1982, he was sentenced by federal officials in Oregon for the federal offense of bank robbery. He was then transported to the United States penitentiary in

---

[2]In 1979, RCW 46.61.506(1) read:

"Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a vehicle while under the influence of intoxicating liquor or any drug, if the amount of alcohol in the person's blood at the time alleged as shown by chemical analysis of his blood, breath, or other bodily substance is less than 0.10 percent by weight of alcohol in the person's blood, *it is evidence that may be considered with other competent evidence in determining whether the person was under the influence of intoxicating liquor or any drug.*" (Italics ours.)

Subsequently, a new section was added to chapter 46.61, which read:

"*A person is guilty of driving while under the influence of intoxicating liquor or any drug if he drives a vehicle within this state while:*

"(1) He has 0.10 percent or more by weight of alcohol in his blood as shown by chemical analysis of his breath, blood, or other bodily substance . . .". (Italics ours.) RCW 46.61.502; Laws of 1979, 1st Ex. Sess., ch. 176, § 1.

Leavenworth, Kansas, to serve his federal sentence.

Pursuant to the IAD Meskuotis was returned to Washington in June 1984 for sentencing on the negligent homicide conviction. On July 10, 1984, he was sentenced on that conviction to two 10–year prison terms to run concurrently with each other but consecutive to the federal sentence. This appeal followed.

### FACTS RELATING TO THE DETAINER

The following sequence of events is pertinent to Meskuotis' claim that he was unlawfully detained in federal penitentiary prior to his sentencing in Washington.

| | |
|---|---|
| 8/10/79 | Meskuotis charged with two counts of negligent homicide under alias "Michael E. Barefield". |
| 12/29/79 | Meskuotis found guilty by jury on both counts. |
| 2/22/80 | Meskuotis fails to appear for sentencing. |
| 1/4/82 | Meskuotis' true identity discovered. |
| 5/17/82 | Meskuotis sentenced by federal officials to 12 years for bank robbery. |
| 6/10/82 | Meskuotis arrives at federal penitentiary in Leavenworth, Kansas. |
| 11/18/82 | Detainer filed by King County Prosecutor's Office. |
| End of 11/82 | Meskuotis receives copy of detainer action letter. |
| 3/83 | Meskuotis writes to attorney who represented him on federal bank robbery charges to find out how he could get transferred to Seattle for sentencing. |
| 4/18/83 | Meskuotis informed by the Public Defense Program Office Coordinator in Seattle that he would be transferred to Seattle when his sentence was completed in Leavenworth. |
| 5/4/83 | Alix Foster, Meskuotis' former trial attorney, advises him of his right to speedy sentencing under the IAD. |

5/5/83   Meskuotis requests copy of detainer from his case manager at Leavenworth. Case manager does not comply.

5/83    Meskuotis obtains copy of his detainer through his work supervisor and writes letters requesting speedy sentencing to Judge Noe and to the King County Prosecutor's Office. Meskuotis requests that these letters, a copy of the IAD, and the necessary certificate be forwarded to Washington. Case manager fails to comply with Meskuotis' request.

11/83   Foster intervenes with federal authorities in Leavenworth.

12/20/83   Detainer processed by federal officials.

1/10/84   Detainer forms received by prosecutor's office in Seattle.

6/14/84   Meskuotis returned to Washington. King County sentencing hearings scheduled. Meskuotis requests continuance.

7/10/84   Meskuotis sentenced.

INTERSTATE AGREEMENT ON DETAINERS

Meskuotis first contends that the trial court erred at his sentencing hearing by denying his motion to dismiss, thereby violating the speedy disposition provision of the IAD, RCW 9.100.

A detainer has been defined as:

[A] request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent. Detainers generally are based on outstanding criminal charges, outstanding parole– or probation–violation charges, or additional sentences already imposed against the prisoner.

(Citations omitted.) *Carchman v. Nash,* 473 U.S. 716, 719, 87 L. Ed. 2d 516, 520, 105 S. Ct. 3401 (1985).

The Interstate Agreement on Detainers is a compact among member states, the United States, the territories

and possessions of the United States, the District of Columbia, and the Commonwealth of Puerto Rico.[3] *Cuyler v. Adams,* 449 U.S. 433, 435 n.1, 66 L. Ed. 2d 641, 101 S. Ct. 703 (1981). IAD, Article 2(a). Because it is a congressionally sanctioned interstate compact, interpretation is a question of federal law. *Cuyler,* at 442.

The IAD provision at issue in this appeal provides a method for the prisoner to initiate resolution of outstanding charges against him:

> Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried *indictment, information or complaint* on the basis of which a detainer has been lodged against the prisoner, *he shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer* and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the *indictment, information or complaint . . .*

(Italics ours.) RCW 9.100.010, Article 3(a).

A. Applicability of the IAD to Sentencing Detainers

By its express terms, the IAD applies only to a detainer based on an "untried indictment, information or complaint". Article 3(a). However, in *Tinghitella v. California,* 718 F.2d 308 (9th Cir. 1983), the Ninth Circuit Court of Appeals construed the IAD to include sentencing detainers. The court reasoned as follows: First, the term "trial" in the speedy trial clause of the sixth amendment to the United States Constitution has been interpreted to include sentencing. *Tinghitella* at 311 (citing *Walsh v. United States,* 423 F.2d 687, 688 (9th Cir. 1970)). Therefore, the requirement of bringing a prisoner to "trial" within 180 days of the

---

[3]For a complete discussion of the disadvantages and abuses suffered by prisoners prior to adoption of the IAD, see *People v. Higinbotham,* 712 P.2d 993, 997–98 (Colo. 1986).

prisoner's giving notice under Article 3(a) should include sentencing the prisoner within 180 days of his giving notice. Second, the IAD itself provides that it "'*shall* be liberally construed so as to effectuate its purposes.'" *Tinghitella,* at 311 (quoting IAD, Article 9). Third, central policy considerations support a broad construction of "trial". The court stated:

> Both the rehabilitative and fair treatment purposes of the IAD would be better effectuated by construing trial to include sentencing. A prisoner with foreknowledge of a time certain for imprisonment in the receiving state (here, California) presumably will more easily undergo rehabilitation than one with knowledge merely of the range of possible sentences. Moreover, treatment of prisoners in the sending state (Texas), including eligibility for "trusty" status and for work–furlough and weekend–furlough, apparently depends on the period of sentence eventually to be served in the receiving state (California).
>
> The facts of this case demonstrate another reason why the IAD should be construed to apply to sentencing. The petitioner cannot appeal from his California conviction until he has been sentenced. A reversal of that conviction on appeal would significantly affect petitioner's rehabilitation in Texas.

*Tinghitella,* at 311 n.5.[4]

The State argues that considerable support for excepting sentencing detainers from the IAD is found in *Carchman v. Nash, supra.* In *Carchman,* the United States Supreme Court held that the IAD does not encompass parole or probation violations. Focusing on the plain language of the statute, the Court stated:

---

[4]Tinghitella was convicted by a California jury of assault with a deadly weapon. His sentencing date was set and he was released on bail. Following his release, Tinghitella fled California and failed to appear for sentencing. Ultimately, he was denied relief by the Ninth Circuit Court of Appeals because, under the law of the receiving state (California), a defendant who absconds prior to sentencing may be sentenced in absentia. Tinghitella had requested only his return to California for sentencing rather than imposition of a sentence whether or not he be present in California. Therefore, his request was flawed. *Tinghitella v. California,* 718 F.2d 308, 311–12 (9th Cir. 1983). Washington law, however, mandates the presence of the defendant at the time of sentencing. CrR 3.4(a), (b).

The language of the Agreement therefore makes clear that the phrase "*untried indictment, information or complaint*" in Art. III refers to criminal charges *pending* against a prisoner. A probation–violation charge, which does not accuse an individual with having committed a criminal offense in the sense of *initiating* a prosecution, thus does not come within the terms of Art. III. Although the probation–violation charge might be based on the commission of a criminal offense, it does not result in the probationer's being "prosecuted" or "brought to trial" . . .

(Italics ours.) *Carchman*, at 725. The Court noted that although the purpose language of the IAD is broad, it must be read in the context of the operative language—specifically, the "untried indictment, information or complaint" language in Article 3 and the "prosecution on the charge or charges" language in Article 5. *Carchman*, at 725. Examining next the legislative history, the Court found that the congressional debates had centered on defendants with "criminal charges" *pending* against them. *Carchman*, at 728–29. The Court thus concluded that parole and probation violators should be excepted from the IAD. *Carchman*, at 728. *See also United States v. Roach*, 745 F.2d 1252 (9th Cir. 1984) (affirming revocation of defendant's probation and determining that Congress did not intend IAD to apply to probation violation).

In *State v. Sparks*, 104 N.M. 62, 716 P.2d 253 (Ct. App. 1986), *cert. denied*, 103 N.M. 798, 716 P.2d 71 (1986), the New Mexico Court of Appeals excepted from the IAD detainers based on outstanding sentencing. The court distinguished the defendant under a sentencing detainer as follows:

[T]he uncertainties which confront a prisoner who has a detainer based on an outstanding indictment, information or complaint are much graver than those arising from an outstanding sentence. In the case of a prisoner affected by a detainer on an untried charge, invocation of the IAD procedures may result in a not guilty verdict totally displacing the detainer. Whereas, in our case, defendant is certain that he has been convicted of three felony offenses.

*Sparks,* at 65–66.

Applying the reasoning in *Carchman,* the New Mexico court noted that meritless detainers are not a threat to those awaiting sentencing:

> As in the case of the probation violation detainer in *Carchman,* however, the fear of filing meritless detainers is not present here. A sound basis supported the filing of this detainer. Defendant here had been convicted, and he had failed to appear for sentencing. The detainer, therefore, was unquestionably legitimate.

*Sparks,* at 65.

■ After considering *Tinghitella, Carchman,* and *Sparks,* we conclude that the IAD should encompass sentencing detainers. Article 9 directs that "[t]his agreement shall be liberally construed so as to effectuate its purposes." Accordingly, we focus on the purpose laid out in Article 1:

> The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and *difficulties in securing speedy trial of persons already incarcerated in other jurisdictions,* produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges . . .

(Italics ours.)

We find that "difficulties in securing speedy trial of persons already incarcerated in other jurisdictions" applies to prisoners awaiting sentencing just as it applies to those explicitly named in the statute—prisoners with detainers based on "untried indictment[s], information[s] or complaint[s]". Unlike the probation violator in *Carchman,* but like the prisoners named in the statute, a prisoner with a sentencing detainer lodged against him has not completed the full process of "trial." Moreover, the hardships faced by prisoners under sentencing detainers and prisoners under detainers based on untried indictments, informations or complaints are the same: uncertainty over the length of the

sentence, inability to appeal, difficulty in obtaining work furlough or weekend furlough privileges, and lessened chances of rehabilitation. We, therefore, hold that Meskuotis is subject to the IAD.

## B. Meskuotis' Confinement

Meskuotis bases his demand for dismissal on two violations of the IAD. First, he maintains that prison officials violated the notice provision of Article 3(c), which states:

> The warden, commissioner of correction or other official having custody of the prisoner shall *promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition* of the indictment, information or complaint on which the detainer is based.

(Italics ours.)

In November 1982 Washington filed the detainer against Meskuotis and sent him a copy. However, the prison officials at Leavenworth did not inform Meskuotis of his right to request final disposition until Alix Foster intervened with the officials in November 1983—a year after the filing of the detainer. Foster, who had been Meskuotis' attorney in his trial for negligent homicide, informed Meskuotis of his rights under the IAD. She also informed officials in the records department at Leavenworth of the *Tinghitella* decision. Until that time, they had assumed that the IAD did not apply to prisoners awaiting sentencing and, consequently, did not inform Meskuotis of his right to request final disposition.

Second, he contends that the prison officials in Leavenworth violated Article 3(b) by failing to promptly forward his request for final disposition to Washington. Article 3(b) states as follows:

> The written notice and request for final disposition referred to in paragraph (a) hereof shall be given or sent by the prisoner to the warden, commissioner of correction or other official having custody of him, *who shall promptly forward it* together with the certificate to the appropriate prosecuting official and court . . .

(Italics ours.)

In May 1983 Meskuotis wrote letters to Judge Noe and to the King County Prosecutor's Office. He gave the letters and a copy of the detainer to his case manager at Leavenworth and requested that the necessary certificate and letters be forwarded to Washington. However, his case manager failed to comply with his request. Thus, although the prison officials in Leavenworth had Meskuotis' notice and request for final disposition, they failed to complete the prompt forwarding of materials required by Article 3(b).

Relief for Meskuotis because of the Leavenworth officials' delay in giving notice and in forwarding his papers to Washington is not available under any of the express provisions of the IAD. Meskuotis' detainer forms were delivered to the prosecutor's office in Seattle on January 10, 1984, and his initial sentencing hearing was scheduled on June 14, 1984: a total period of 154 days. Hence, Meskuotis was still sentenced within 180 days of the prosecutor's receipt of his detainer forms from Leavenworth. Under the IAD, dismissal of the charge in the receiving state (Washington) is authorized in only three instances: (1) if, after a prisoner has made the required request pursuant to Article 3, trial does not occur within the required 180 days—Article 5(c); (2) when trial does not occur before the prisoner, having been transferred to the receiving state, is returned to the sending state—Article 4(e); (3) when the receiving state fails or refuses to accept temporary custody of the prisoner—Article 5(c). Under Article 3(a), Meskuotis was sentenced within 180 days of "causing his request to be delivered" to the prosecuting officer in Washington.

Several cases have held that violation of the prompt forwarding provisions of Article 3(b) may require dismissal of the charges. *See, e.g., Rockmore v. State,* 21 Ariz. App. 388, 519 P.2d 877 (1974) (information dismissed; IAD triggered when sending state receives defendant's request for final disposition); *Pittman v. State,* 301 A.2d 509 (Del. 1973) (indictment dismissed after continued requests from

defendant result in delay; prison officials have absolute burden to act upon defendant's request); *Nelms v. State,* 532 S.W.2d 923 (Tenn. 1976) (indictment dismissed for failure to act on defendant's request for final disposition); *Burns v. State,* 578 S.W.2d 650 (Tenn. Crim. App. 1978) (indictment dismissed; IAD triggered by prisoner's request for final disposition).

Violation of the notice provision of Article 3(c) has produced various results. *See, e.g.,* cases not dismissing charges: *Coit v. State,* 440 So. 2d 409 (Fla. Dist. Ct. App. 1983) (IAD prompt notice provision directory; violation thereof does not result in dismissal of charges); *State v. Clark,* 222 Kan. 65, 563 P.2d 1028 (1977) (IAD prompt notice provision directory only because IAD has no sanction for failure to comply); *Commonwealth v. Gonce,* 320 Pa. Super. 19, 466 A.2d 1039 (1983) (dismissal allowed only under explicit provisions of the IAD). Those cases that dismissed charges for notice violations include *People v. Lincoln,* 42 Colo. App. 512, 601 P.2d 641 (1979) (compliance with notice provisions is mandatory) and *People v. Office,* 126 Mich. App. 597, 337 N.W.2d 592 (1983) (failure to bring formal charges against defendant violates good faith and the spirit of the IAD).

■ Having considered the foregoing cases, we conclude that Congress intended sanctions to be applied only where they are expressly allowed under the IAD. To conclude otherwise would result in *ad hoc* determinations by individual member states determining whether officials had acted "promptly". It is for Congress, not the courts, to set time limits for giving notice and for forwarding materials. We, therefore, hold that dismissal under the IAD is not mandated in this case.

BLOOD TEST RESULTS

Meskuotis next contends that the trial court erred by admitting results of his blood alcohol test.

The provision applicable to this issue in 1979 was RCW 46.20.308, which read in pertinent part:

(1) Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent, subject to the provisions of RCW 46.61-.506, to a chemical test or tests of his breath or blood for the purpose of determining the alcoholic content of his blood . . . *Such officer shall inform the person of his right to refuse the test, and of his right to have additional tests administered* by any qualified person of his choosing as provided in RCW 46.61.506. . . . *Provided,* That if an individual is under arrest for the crime of negligent homicide by motor vehicle as provided in RCW 46.61.520, . . . a breath or blood test may be administered without the consent of the individual so arrested.

(Italics ours.) Even though the State's test is mandatory, the right to notice of the independent test still applies to those arrested for negligent homicide. *State v. Turpin,* 94 Wn.2d 820, 824–25, 620 P.2d 990 (1980); *State v. Sanchez,* 42 Wn. App. 225, 229, 711 P.2d 1029 (1985).

■ The officers at the hospital failed to advise Meskuotis of his right to an additional test. However, at the time that blood was drawn, Meskuotis appeared to be unconscious. The arresting officer advised him of his constitutional rights, but Meskuotis did not respond to the officer's questions and statements. Although Meskuotis swore and thrashed around somewhat, he was not coherent the entire time the police were with him. Further, Meskuotis testified that he remembered nothing about his stay in the hospital until he woke up in September. Consequently, any notice to Meskuotis regarding the right to an additional test would have been pointless, and failure to give the information did not affect the outcome of the trial.

Meskuotis also objects to lack of foundation for admitting the vial of blood into evidence. Before admitting a blood sample into evidence, the State must establish a prima facie case that the sample is free from adulteration. *Hoffman v. Tracy,* 67 Wn.2d 31, 34, 406 P.2d 323 (1965); *Wooldridge v. Woolett,* 28 Wn. App. 869, 872, 626 P.2d 1007, *aff'd,* 96 Wn.2d 659, 638 P.2d 566 (1981). WAC 448-14-020(3) requires that the test shall employ a clean dry

container and samples preserved with anticoagulant. WAC 448–14–020 requires that a blank test be run.

The State satisfied the prima facie requirement as follows: A Washington State toxicologist who had performed 8,000 to 9,000 blood alcohol tests throughout his 8–year career administered the test. He testified that while the vial was in his possession, it was not adulterated. He further stated that this vial manufacturer always puts anticoagulants in this type of vial, although, in his opinion, the presence or absence of anticoagulant would not affect the tests. Both the literature put out by the company and the label on the vial indicated there was anticoagulant in this type of vial. Regarding the blank test, he testified to an alternative method of running a blank test that was the equivalent of a blank test. Regarding the cleanliness of the container, the doctor who drew Meskuotis' blood at the Auburn hospital testified that he did not have personal responsibility for the vial's cleanliness but that it came from the hospital laboratory. A prima facie showing having been made, it was for the jury to determine the weight to attach to the evidence. *Hoffman v. Tracy, supra* at 35.

### JURY INSTRUCTIONS

Meskuotis next argues that the trial court erred by instructing the jury that it was not required to be unanimous in deciding which of the three alternative means was used to commit the offense.

■ Under former RCW 46.61.520(1) a conviction of negligent homicide may be predicated on findings that the defendant caused the death of a person (1) by driving a vehicle while under the influence of intoxicating liquor or drugs, (2) by operation of a vehicle in a reckless manner, or (3) by operation of a vehicle with disregard for the safety of others. The jurors are not required to be unanimous on which of the three means the State has proven, provided the alternate means are not repugnant to each other and provided there is substantial evidence to support each of these means. *State v. Orsborn,* 28 Wn. App. 111, 117, 626

P.2d 980 (1980), *review denied,* 97 Wn.2d 1012 (1982). *Accord, State v. Arndt,* 87 Wn.2d 374, 377, 553 P.2d 1328 (1976). "Substantial evidence is evidence in sufficient quantum to persuade a fair–minded person of the truth of the declared premise." *Holland v. Boeing Co.,* 90 Wn.2d 384, 390–91, 583 P.2d 621 (1978).

The standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

Here the alternate means were not repugnant to one another and there was substantial evidence to convict Meskuotis under each of the means. The troopers testified that, based on the close proximity of his body to the point of impact and based on his leg injury, Meskuotis was the driver of the Volkswagen pickup. A trooper also testified that judging from the tire marks, scuff marks, and gouge marks, the Volkswagen pickup had crossed the center line and, thus, had caused the accident. Another trooper said that the Volkswagen Rabbit had been knocked backward and lifted up into the air. The evidence also showed that Meskuotis was intoxicated. One trooper testified that Meskuotis smelled strongly of alcohol, and blood tests run after the accident showed that his blood alcohol content was .18 percent. Meskuotis himself testified that he had consumed several strong drinks the day of the accident.

The foregoing was evidence substantial enough to convince a rational trier of fact that Meskuotis had caused the deaths of both his passenger and the driver of the other car while driving recklessly, with disregard for the safety of others, or while intoxicated.

### ADMISSION OF PHOTOGRAPH

Finally Meskuotis contends that the trial court erred by admitting an accident scene photograph of the deceased driver of the second car slumped over in his seat with blood on his arm.

At trial defense counsel objected to admission of the photograph on grounds that it was needlessly cumulative. *See* ER 403. On appeal Meskuotis also contends that the photograph was overly gruesome. A party may only assign error on appeal on the specific ground of the evidentiary objection made at trial. *State v. Guloy,* 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986); *State v. Boast,* 87 Wn.2d 447, 452, 553 P.2d 1322 (1976). Because Meskuotis' objection appears to have been based on the repetitive use of gruesome photographs, we shall consider his objection properly taken under ER 403.

▐ Photographs are admitted within the sound discretion of the trial court. *State v. Ferguson,* 100 Wn.2d 131, 667 P.2d 68 (1983). Even repulsive photographs are admissible if their probative value outweighs their prejudicial effect. *State v. Crenshaw,* 98 Wn.2d 789, 806, 659 P.2d 488 (1983). *See also State v. Hatley,* 41 Wn. App. 789, 706 P.2d 1083, *review denied,* 104 Wn.2d 1024 (1985). In limiting the use of gruesome photographs, the court in *Crenshaw* stated:

> Prosecutors are not given a carte blanche to introduce every piece of admissible evidence if the cumulative effect of such evidence is inflammatory and unnecessary. In other words, in such situations where proof of the criminal act may be amply proven through testimony and noninflammatory evidence, we caution prosecutors to use restraint in their reliance on gruesome and repetitive photographs.

*Crenshaw,* at 807.

In this instance, we perceive no abuse of discretion. One of the primary issues at trial was the angle of impact of the two vehicles. The challenged photograph is probative of that issue to the extent it shows the amount and type of damage to the decedent's car and the position of the decedent after the collision. There were two other photographs of the driver's side of the vehicle admitted, but this one showed a different angle.

In *State v. Sargent,* 40 Wn. App. 340, 698 P.2d 598 (1985), the trial court admitted four autopsy photographs

and two photographs showing the victim on a waterbed. The Court of Appeals reversed, holding that one autopsy picture would have been sufficient to show premeditation inferable from the force of the blows to the victim's head. The court found the pictures on the waterbed unnecessary because firemen had testified to the same information depicted by the pictures. By contrast, in *State v. Sanchez,* 42 Wn. App. 225, 711 P.2d 1029 (1985), the court upheld admission of a photograph of the decedent showing her after she had been extricated from her automobile because her injuries and the position of her clothing were relevant to the force of the impact. Unlike the situation in *Sargent,* the State here does not rely on an excess number of gruesome photos. This exhibit was the only full–torso picture of the deceased admitted. Two other pictures showed only small portions of his body. Like the situation in *Sanchez,* the photograph was relevant to prove the force of the impact. We thus conclude that the probative value of this evidence substantially outweighed its prejudicial or cumulative effect.

Affirm.

WILLIAMS and PEKELIS, JJ., concur.

Reconsideration denied May 21, 1987.

Review granted by Supreme Court September 1, 1987.