73 P.3d 416 (2003)
117 Wash.App. 758
STATE of Washington, Respondent,
v.
Vlastimil KLIMES, Jr., Appellant.
No. 47198-8-I.
Court of Appeals of Washington, Division 1.
July 28, 2003.
*417 Christopher Gibson, Kathryn A. Russell Selk, Seattle, WA, for Appellant.
David M Seaver, King County Pros. Office, Seattle, WA, for Respondent.
KENNEDY, J.
Vlastimil Klimes, Jr., was convicted by a jury of second degree burglary for "unlawfully entering or remaining" in a Maple Valley junkyard while it was open for business. His *418 appeal raises an issue of first impression in Washington: Do the burglary statutes provide alternate means of committing burglary, that is, an "enters unlawfully" means and a "remains unlawfully" means? We hold that they do. We reverse Klimes' conviction and remand for a new trial solely on the "enters unlawfully" means of committing this alleged second degree burglary because (1) under the facts of this case substantial evidence supports only the "enters unlawfully" means and the alternate means are repugnant to one another; (2) the prosecutor failed to elect the "enters unlawfully" means and misstated the law by telling the jury that it could convict Klimes for unlawfully remaining in the junkyard even if it believed Klimes' testimony that he entered through the front gate while the junkyard was open for business; and (3) the jury verdict did not specify the means upon which the conviction was based. RCW 9A.52.010(3) defines "enters or remains unlawfully" for purposes of the burglary and trespass chapter of the Washington Criminal Code as follows: "A person `enters or remains unlawfully' in or upon premises when he is not then licensed, invited, or otherwise privileged to so enter or remain." As the State properly concedes, a person whose license, invitation, or privilege to enter or remain in a retail establishment has never been withdrawn and who enters the store through a public entrance while the store is open for business is licensed, invited, or otherwise privileged to enter or remain, even if he intends from the start to shoplift or forms that intent while inside the store.
Contrary to Klimes' contention, substantial evidence at the trial supported the "enters unlawfully" means of committing second degree burglary. Accordingly, total dismissal of the charge is not warranted.[1]

FACTS
On the afternoon of Sunday, April 25, 1999, Officers Klophenstein and Riches responded to a report of suspicious persons at a junkyard in Maple Valley, Washington. The junkyard is a very large complex surrounded by cyclone fencing topped with concertina wire. The public access is through a gate on one side of the lot next to the junkyard office where customers are expected to stop and pay for their purchases on their way out of the yard. The junkyard was open for business and busy at the time of the suspicious persons call. Customers were inside the lot roaming unattended and removing parts from junked cars for purchase at the office. The owner of the junkyard testified at trial that he did not see everyone who entered the lot on that day.
The officers parked in a lot that is near a car wash and a small strip mall at the opposite side of the junkyard from its public entrance. A trail leads downhill from the lot where the officers parked, winds through some trees, crosses a culvert, and continues up a small hill to the fence at the back part of the junkyard. The officers followed the trail, looking for suspicious people. As they neared the junkyard, they saw two men inside the fence amid a row of cars, dismantling an engine. A pile of tires was stacked against the outside of the fence. The officers scrambled up the pile of tires and over the fence into the junkyard. They approached the two men, who were appellant Klimes and his father.
Officer Klophenstein asked Klimes and his father whether they had permission to be inside the yard. Officer Riches testified that he was not able to understand the response clearly, and that he felt there was some kind of a language barrier. Officer Klophenstein asked the two men for identification. Klimes' father gave Officer Klophenstein his keys, and told him that his identification was inside a van back at the same lot where the officers had parked. At that point, the officers decided to detain Klimes and his father, so they handcuffed them, helped them over the fence, and escorted them to the van, which was backed into position near the head of the trail leading to the junkyard.
After opening the van and obtaining both men's identification from their wallets, Officer Klophenstein noticed that the van contained *419 a car hood and several other auto parts. Officer Riches brought the junkyard owner to the location of the van. The owner identified the hood and auto parts as being from cars that he owned that were inside the junkyard.
The owner testified at trial that he had no record of having sold the hood and parts, that he knew Klimes' father from previous encounters in the junkyard, and that he had instructed Klimes' father a few months earlier that he was forbidden from returning to the junkyard. The owner also testified that he was required to keep an inventory of major component parts of vehicles that he sold, such as fenders, hoods, bumpers, or engines, which he did by means of a numbering system. He did not use the numbering system for non-major component parts. Nor did he use a cash register. Instead, money from sales went "into pockets." A computer-generated invoice served as the customer's receipt for major component parts. For other parts, customers were given a handwritten receipt only if they asked, and some were told, even if they asked, that they did not need a receipt but would be remembered if they came back to the junkyard to return parts. The owner also testified that Klimes, unlike his father, had never been told that he was prohibited from coming to the junkyard.
Klimes testified at trial through an interpreter. He stated that he and his father had gone to the car wash near the junkyard to wash the engine of their van before going to the junkyard to look for a carburetor. After washing the engine, they tried to drive out of the washing bay but the van would not start, so they pushed the van to the parking lot. Then, they walked down the road and around the block to the front entrance of the junkyard and entered through the front gate. They had been browsing through the yard for approximately 45 minutes when the police officers arrived. Klimes also testified that he had purchased the car hood police found in the van earlier in the week at the same junkyard. He was not given a receipt; in fact, he had never been given a receipt for any of the parts he had purchased from the yard during previous visits.
Klimes was charged with one count of second-degree burglary by entering or remaining unlawfully in the junkyard with the intent to steal car parts. The State's primary theory at trial was that Klimes and his father entered the junkyard the same way the police officers didby climbing up the tires and over the back fence of the junkyard and that the car parts in the van found their way there by the same route over the back fence and up the path to the van. But during closing arguments, the prosecutor responded to Klimes' testimony at trial by telling the jury that even if Klimes had lawfully entered the junkyard through the front gate as he claimed, the owner did not have the junkyard open to invite the public in to steal from him: "When you go there and your sole intent is to commit a crime, there is an implied ... revocation of that invitation to come on the premises. It is implied that you are not welcome there, that you have no privilege to be there." Vol. 4 Report of Proceedings at 60. The prosecutor also told the jury that once the criminal conduct started, Klimes "was then unlawfully remaining. He had no right to stay there[.]" Id. at 61. During rebuttal argument, the prosecutor added:
[Defense counsel] misstates the law when he says that the state is required to prove to you that his client entered and remained unlawfully. Instruction number 7 is the to convict instruction. It tells you the elements that the state is required to prove, and it is written in the disjunctive, that the defendant entered or remained. The state does not need to prove he did both and you do not need to be unanimous with regard to whether he did both. Some of you can think the entering was unlawful and some of you can think the remaining [was] unlawful, as long as together you unanimously agree that he entered or remained unlawfully.
Id. at 87-88.
The jury returned a guilty verdict, and the court sentenced Klimes to 15 days confinement. This appeal followed.

ANALYSIS
RCW 9A.52.030(1) provides that a person is guilty of burglary in the second *420 degree if he enters or remains unlawfully in a building other than a vehicle or a dwelling with intent to commit a crime against persons or property therein. It is undisputed that the fenced-in junkyard in this case is a "building" for purposes of this statute. See RCW 9A.04.110(5) (stating that "`[b]uilding', in addition to its ordinary meaning, includes any ... fenced area"). See also State v. Wentz, 149 Wash.2d 342, 68 P.3d 282 (2003).
The elements of burglary in the second degree include (1) enters or remains unlawfully in a building (2) with intent to commit a crime against persons or property therein. "Enters or remains unlawfully in a building" is commonly treated as a single element in courts' "to convict" instructions to juries. See WPIC 60.04, stating in relevant part that to convict the defendant of the crime of burglary in the second degree the State must prove beyond a reasonable doubt: "(1) That on or about [date] the defendant entered or remained unlawfully in a building [other than a dwelling]; (2) That the entering or remaining was with intent to commit a crime against a person or property therein[.]" The "to convict" instruction in this case was based on WPIC 60.04.
Klimes argues that the "enters or remains unlawfully" element includes alternate means of committing burglary. The State argues that it does not and that, instead, "enters or remains unlawfully" is the single means of committing this single element of the offense. We agree with Klimes. Although this question has never been addressed directly in a published Washington opinion, cases applying the burglary statutes have consistently construed "enters unlawfully" and "remains unlawfully" as separate acts.
In State v. Collins, 110 Wash.2d 253, 751 P.2d 837 (1988) the defendant was tried at a bench trial and convicted of first degree burglary. The evidence was undisputed that the defendant was permitted to enter the victims' home after he knocked on the door, said that his car had broken down, and asked if he could come in to use the telephone. Minutes after entering the home, Collins physically assaulted both occupants and raped one of them. The trial judge rejected the contention that Collins gained entry by fraud; thus, his entry into the home was lawful. But the judge also found that once inside the home, Collins' purpose changed from using the telephone to assaulting the victims and raping one of them. Accordingly, the judge found Collins guilty of first degree burglary for unlawfully remaining in the home with the intention of committing these crimes. The Court of Appeals reversed the conviction but the Supreme Court reinstated it, stating, however, that whether the "remains unlawfully" element can be inferred from the State's successful showing of the separate element of intent to commit a crime must be decided on a case by case approach:
While the formation of criminal intent per se will not always render the presence of the accused unlawful, that presence may be unlawful because of an implied limitation on, or revocation of, his privilege to be on the premises.
. . . .
... The record supports an inference that the invitation or license extended to Collins was limited to a specific area and a single purpose. Collins was a total stranger. Charlotte made an offer only of the use of her telephone. She led him to one particular telephone and handed it to him herself. No reasonable person could construe this as a general invitation to all areas of the house for any purpose.
A second theory, likewise to be applied on a case by case basis, supports the same result. Once Collins grabbed the two women and they resisted being dragged into the bedroom, any privilege Collins had up to that time was revoked.
Collins, 110 Wash.2d at 257-58, 261, 751 P.2d 837.
In State v. Thomson, 71 Wash.App. 634, 637-39, 861 P.2d 492 (1993) the defendant was convicted of first degree rape at a bench trial based on the court's finding that he feloniously entered into the bedroom where the victim was situated. The defendant claimed on appeal that he was only guilty of second degree rape because the undisputed evidence at trial established that he entered the home by invitation of the victim. The *421 defendant then made sexual advances, which the victim rebuffed. She told the defendant that he could sleep in the guestroom and she entered her own bedroom and locked the door. During the night, the defendant broke in the bedroom door and engaged in sexual intercourse with the victim by forcible compulsion. The Court of Appeals reversed and remanded for entry of a finding of guilt as to second degree rape.
In so ruling, the court took careful note of the Supreme Court's decision in Collins and readily agreed that although Thomson's entry into the victim's home was lawful, his entry into her locked bedroom was feloniousand he could have been found guilty of burglary on the basis of unlawfully remaining in the home with the intent to rape the victim. Thomson, 71 Wash.App. at 641, 861 P.2d 492. But Thomson was not charged with burglary, he was charged with first degree rape and the statute at issue, RCW 9A.44.040(1)(d), provided that the defendant was guilty of first degree rape only if he engaged in sexual intercourse with the victim by forcible compulsion after feloniously entering the "building" where the victim was situated. That statute contained no felonious remaining element. The court concluded that the locked bedroom was not a "building" within the meaning of subsection (d) of the first degree rape statute and RCW 9A.04.110(5) (the statute defining "building" for purposes of Title 9A) because the victim's home was not in a multi-unit dwelling. 71 Wash.App. at 642-46, 861 P.2d 492.[2]
Collins and Thomson make it clear that "enters unlawfully" and "remains unlawfully" are separate acts, and that a person can enter lawfully but remain unlawfully in some factual circumstances.
We next examine whether lawful entry into a retail establishment that is open for business is a factual circumstance under which a person can be said to remain unlawfully because he intends to commit a crime against property thereinto shoplift, for example. Our case law makes it clear that in such a circumstance, the person cannot be convicted of burglary based on unlawful remaining. In State v. Miller, 90 Wash.App. 720, 954 P.2d 925 (1998), the defendant's conviction for second degree burglary was reversed because, having lawfully entered a car wash that was open to the public, the defendant could not be convicted of burglary on the basis of unlawfully remaining after he broke into several coin boxes and stole money from them. The State's theory was that no business owner would allow entry for the purpose of committing a crime; therefore, any entry or remaining for a criminal purpose would violate the license, invitation, or privilege. But under this theory, every shoplifting inside a building would be elevated from a misdemeanor to a class B felony, a result that would far exceed the intent of our Legislature. 90 Wash.App. at 725, 730, 954 P.2d 925. Thus, the Miller court rejected the same theory that the prosecutor argued to the jury at Klimes' trial.
A different result obtains when the defendant has previously been barred from returning to the business premises. In State v. Kutch, 90 Wash.App. 244, 951 P.2d 1139 (1998), the defendant shoplifted from a Mervyn's store in the Yakima Mall. Mervyn's security guards arrested Kutch and handed him a written form notifying him that his invitation to enter the Yakima Mall was revoked for a full year. Six months later, Kutch entered the Mervyn's store and shoplifted again. He was arrested, charged and convicted of second degree burglary. His conviction was affirmed because "[f]or purposes of the unlawful entry element of second degree burglary, the prior notice given to Mr. Kutch effectively revoked his invitation to go into the mall premises." 90 Wash. App. at 249-50, 951 P.2d 1139.
We conclude from these cases that "enters unlawfully" with intent to commit a crime therein and "remains unlawfully" with intent to commit a crime therein are alternate means of committing burglary. We are not persuaded otherwise by the State's arguments based on State v. G.S., 104 Wash.App. 643, 17 P.3d 1221 (2001) (overruled on grounds not relevant here by State v. J.M., 144 Wash.2d 472, 28 P.3d 720 (2001)), where *422 the court held that the "most natural reading" of the harassment statute was that the Legislature created four alternative means one under each of the separate subsections (i), (ii), (iii), and (iv) of section (1)(a)of committing the crime, and thus the first means, subsection (i), did not provide two separate means. G.S., 104 Wash.App. at 648-50, 17 P.3d 1221. The G.S. court reasoned that If the Legislature had intended the conduct in subsection (i) to constitute two alternative means of committing harassment, it would have specifically set forth those alternatives in separate subsections, as it had in the remainder of section (1)(a). Id. at 650, 17 P.3d 1221; see also State v. Barefield, 47 Wash.App. 444, 735 P.2d 1339 (1987), aff'd, 110 Wash.2d 728, 756 P.2d 731 (1988) (separate subsections within RCW 46.61.520 provide alternate means by which to commit negligent homicide); State v. Gillespie, 41 Wash.App. 640, 705 P.2d 808 (1985) (separate subsections within RCW 9A.56.020 provide alternate means by which to commit first degree theft).
The G.S. court did not hold that statutes without distinctly delineated subsections may only be read as providing one means of committing the offense, however. In fact, the court specifically discussed two cases where the offense at issue was defined in a single paragraph without the use of separately delineated subsections, and noted that the statute in one of those cases had been held to provide alternative means while the statute in the other case was read to provide only one means. 104 Wash.App. at 649-50, 17 P.3d 1221.[3]
We agree with the State that the use of the disjunctive "or" does not invariably indicate legislative intent to provide alternate means of committing a crime. Such a bright line rule certainly would ease the work of the courts, but there simply is no bright line rule by which the courts can determine whether the Legislature intended to provide alternate means of committing a particular crime. Instead, each case must be evaluated on its own merits.[4]
Jury verdicts in criminal cases must be unanimous as to the defendant's guilt of the crime charged. State v. Ortega-Martinez, 124 Wash.2d 702, 707, 881 P.2d 231 (1994) (citing Const. art. 1, § 21). In some situations, the right to jury unanimity includes the right to express unanimity as to the means by which the defendant committed the crime. Id. The threshold test governing whether express unanimity is required as to an alternate means of committing the crime is whether sufficient evidence exists to support *423 each of the alternate means presented to the jury. Id. If the evidence is sufficient to support each such means, a particularized expression of unanimity as to the means by which the defendant committed the crime is unnecessary. But if the evidence is insufficient to present a jury question as to whether the defendant committed the crime by any one of the means submitted to the jury, a general verdict of guilt cannot stand unless the prosecutor elected or the court instructed the jury which means to rely on in its deliberations. Id. at 707-08, 881 P.2d 231; State v. Kitchen, 110 Wash.2d 403, 409, 756 P.2d 105 (1988); State v. Rivas, 97 Wash.App. 349, 351-52, 984 P.2d 432 (1999). Jury unanimity requirements may also be met if each of the means is supported by substantial evidence in the record and the means are not repugnant to one another. State v. Whitney, 108 Wash.2d 506, 508, 739 P.2d 1150 (1987); State v. Arndt, 87 Wash.2d 374, 376, 553 P.2d 1328 (1976).
Here, the jury's verdict did not expressly state the means by which the jury found Klimes to have committed second degree burglary, and the prosecutor did not elect the means upon which the State relied nor otherwise direct the jury which means to rely upon in its deliberations. To the contrary, the State told the jury that it did not have to be unanimous as to whether Klimes committed burglary by unlawfully entering or by unlawfully remaining in the junkyard: "[Y]ou do not need to be unanimous with regard to whether he did both. Some of you can think the entering was unlawful, and some of you can think the remaining [was] unlawful, as long as together you unanimously agree that he entered or remained unlawfully." Vol. 4 Report of Proceedings at 87-88.
But as we have shown, because the junkyard was a business that was open to the public at the time of the charged offense, if the jury believed Klimes when he testified that he and his father walked around the block and entered the junkyard through the front gate it could not properly have convicted him of second degree burglary on the theory that he unlawfully remained for the purpose of committing theft. And neither could it properly have convicted him of that crime on the theory that if he entered through the front gate with the intent to commit theft his entry was rendered unlawful. See Miller, 90 Wash.App. at 725, 954 P.2d 925 (it is immaterial whether Miller formulated the intent to steal the contents of the coin boxes before he entered the car wash or after he was already present; Washington law does not provide that entry or remaining in a business open to the public is rendered unlawful by the defendant's intent to commit a crime).
Accordingly, Klimes can properly be convicted of second degree burglary only if he entered the junkyard over the back fence with the intent to commit a crime therein, rather than through the front gate. Klimes does not contend that a person who enters a business by climbing a fence or breaking in through a window at the back of the store or some other unlawful means is rendered lawful by the fact that the premises are open for business to those members of the public who choose to use the front door; nor could he. "A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part of a building which is not open to the public." RCW 9A.52.010(3). It could not reasonably be said that the junkyard owner extended a license for members of the public to enter or leave the yard over the back fence rather than through the front gate located by the office where shoppers are intended to pay for their purchases. The concertina wired fence surrounding the lot gave notice to the public that the only permissible means of entering and leaving the junkyard was through the front gate, even during normal business hours.
We reject Klimes' contention that the charge must be dismissed in its entirety because there is a lack of substantial evidence that Klimes entered the junkyard unlawfully.[5] A rational trier of fact could conclude *424 from the evidence at trial that Klimes and his father entered the junkyard the same way the officers didby climbing over the fence using the tires that were stacked against the fence at the end of the trail leading from the parking lot where the Klimes' van was left. Klimes' father had been barred from returning to the yard; yet he was found inside the yard along with Klimes. Klimes did not testify that he used the front gate while his father used some other means of gaining entry. Rather, he testified that both of them came through the front gate.[6] The Klimes' van was positioned nose out in close proximity to the trail leading to the pile of tires. The tires provided a convenient means of entry over the fence, and although it is unclear whether going back over the fence was as easily achieved, the testimony reflects that the officers and the Klimes were able to climb over the fence when leaving the junkyardeven with both of the Klimes wearing handcuffs. During closing argument, the prosecutor pointed out to the jury that in the position the van was found, it would have to have been pulled from the car wash, rather than pusheda considerably more difficult task. Moreover, the van was found at a considerable distance from the car wash, well past more convenient spots where a disabled van could have been left. Both Klimes and his father left their wallets in the van while they went to the junkyard, rather than in their pockets as would have been expected if they had entered by way of the front entrance to look for a carburetor to purchase. Finally, a car hood and other parts that the owner testified were his were found in the van. The owner's testimony certainly was equivocal regarding whether a receipt would have been issued if the parts had been purchased earlier in the week as Klimes claimed. Still, the car hood was one of the major component parts that the owner testified would have resulted in a computer-generated invoice if it had been purchased, and no such invoice existed. In sum, there was substantial evidence upon which a rational trier of fact could conclude beyond a reasonable doubt that Klimes entered the junkyard unlawfully, by climbing over the back fence, with intent to commit a crime against property inside the junkyard.
Accordingly, we reverse and remand for a new trial in accord with this opinion.
GROSSE and SCHINDLER, JJ., concur.
NOTES
[1] This decision makes it unnecessary for us to address Klimes' remaining contentions regarding the erroneous accomplice liability instruction, prosecutorial misconduct, and ineffective assistance of counsel.
[2] RCW 9A.04.110(5) provides in relevant part that "each unit of a building consisting of two or more units separately secured or occupied is a separate building[.]"
[3] In State v. Roche, 75 Wash.App. 500, 878 P.2d 497 (1994), it was held that Washington's robbery statute creates two alternative means by which an individual may commit that offense. The robbery statute provides, in pertinent part:

A person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone.
RCW 9A.56.190. The alternate means were determined to be taking property: (1) "from the person of another," or (2) "in his presence." G.S. 104 Wash.App. at 649, 17 P.3d 1221, citing Roche, 75 Wash.App. at 511, 878 P.2d 497.
In State v. Martinez, 76 Wash.App. 1, 884 P.2d 3 (1994), on the other hand, it was held that Washington's extortion statute did not provide for alternative means by which to commit the offense. The extortion statute provides: "`Extortion' means knowingly to obtain or attempt to obtain by threat property or services of the owner, and specifically, includes sexual favors." RCW 9A.56.110. The Martinez court held that, despite the presence of the disjunctive "or," to obtain or attempt to obtain was one and the same crime, committed by a single means, the making of the extortive threat. G.S., 104 Wash. App. at 649-50, 17 P.3d 1221, citing Martinez, 76 Wash.App. at 6, 884 P.2d 3.
[4] The Roche decision has not been particularly helpful to our analysis in this case; in fact, we might have decided that particularly case differently. We are not persuaded that taking personal property (1) from the person of another, or (2) in his presence, against his will by the use or threatened use of immediate force, violence or fear of injury are separate means of committing robbery. Whether the personal property is stolen from the victim's pocket or from the room in which the victim is located while the victim is kept from interfering by use or threatened use of immediate force, violence or fear of injury seems immaterial to us, in light of the criminal conduct that the Legislature sought to deter by enacting the robbery statutes. But in the case of the burglary statutes, where lawful entry into a business premises that is open to the public precludes basing guilt on unlawful remaining, the situation is quite different.
[5] In reviewing a challenge to the sufficiency of the evidence, we look at the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. State v. Green, 94 Wash.2d 216, 221, 616 P.2d 628 (1980).
[6] The parties have not briefed the interesting question of whether a person whose own entry into a business premises is lawful can be found guilty as an accomplice for knowingly facilitating the unlawful entry of another person with the intent to commit a crime against persons or property therein. Our ruling should not be construed to preclude such a theory at trial, based, however, on proper briefing to permit the trial court to make an appropriate ruling on the issue.