[No. 54038–1. En Banc. June 16, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. MICHAEL E. BAREFIELD, *Petitioner.*

*Michael Filipovic* of *Seattle–King County Public Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Michael T. DiJulio, Deputy,* for respondent.

DORE, J.—We hold that the Interstate Agreement on Detainers, RCW 9.100.010, does not apply to sentencing

proceedings and that the trial court did not err in admitting the results of a blood alcohol test. We affirm petitioner's conviction for negligent homicide.

## FACTS

Michael E. Barefield[1] was convicted of negligent homicide, former RCW 46.61.520. While driving northbound on State Route 169 on July 6, 1979, in a Volkswagen pickup truck, Barefield crossed the center line and rammed a car. The driver of the other car and Barefield's passenger, Kenneth Gilbert, were killed. Barefield was severely injured and was taken to Valley General Hospital. While Barefield remained unconscious, a State Patrol trooper directed the attending physician to conduct a blood alcohol test. The test showed Barefield's blood alcohol level to exceed .10 percent.

The trooper did not advise Barefield of his right to "additional tests administered by any qualified person of his choosing . . ." Such a warning is prescribed by former RCW 46.20.308(1); Laws of 1975, 1st Ex. Sess., ch. 287, § 4, p. 1225. Barefield was conscious at times and during such periods was advised of his *Miranda* rights. Even when conscious, however, Barefield was in shock and in critical condition, with painful injuries including fractures of both legs, lacerations and a skull fracture.

Following his conviction in December 1979, Barefield was scheduled for sentencing the following February. He did not appear, however, and a bench warrant was issued for his arrest. The King County Prosecutor's Office subsequently discovered that Barefield, under the name Meskuotis, had been convicted of robbery in Oregon and had been sentenced to 12 years in the federal penitentiary at Leavenworth, Kansas.

In November 1982, King County officials filed a detainer for Barefield at Leavenworth, and Barefield was provided with a copy. Barefield was not informed of his right to

---

[1]Michael E. Barefield is an alias used by George Meskuotis. We refer to Barefield to conform to the pleadings at earlier stages of this case.

request a speedy disposition of his case in Washington. After being informed by his Seattle trial counsel that he had such a right, Barefield drafted letters to Judge James Noe and the King County Prosecutor's Office, and asked his Leavenworth case manager to forward them to Washington. His request was refused.

Leavenworth officials acted on the assumption that the IAD does not apply to detainers for sentencing proceedings. On October 12, 1983, the Ninth Circuit held in *Tinghitella v. California*, 718 F.2d 308 (9th Cir. 1983) that the IAD's provisions regarding speedy trial do apply to sentencing detainers. After being informed of the *Tinghitella* decision, Leavenworth officials provided Barefield with a form requesting speedy disposition and forwarded the request to Washington. Barefield signed the forms on December 20, 1983.

Barefield was returned to Washington for sentencing, and was scheduled to be sentenced on June 14, 1984. Sentencing was later continued at Barefield's request.

### THE IAD DOES NOT APPLY TO SENTENCING DETAINERS

The Interstate Agreement on Detainers (IAD) RCW 9.100.010 provides that, when a detainer is filed with the state having custody, those in charge of the prisoner must provide the prisoner with a copy of the detainer and inform him of his right to request speedy disposition of the pending charges in the receiving state. Conversely the prisoner is required to inform the officials having custody of him of his desire for speedy disposition. It is then the duty of those officials to provide him with the proper forms and to forward those papers promptly to the receiving state. The IAD provides that the prisoner must be tried within 180 days of his giving notice to those who have him in custody. RCW 9.100.010, Article 3.

The IAD's provisions apply to detainers filed in connection with "any untried indictment, information or complaint". RCW 9.100.010, Article 3. The Ninth Circuit held in *Tinghitella v. California*, 718 F.2d 308 (9th Cir. 1983)

that the IAD applies to detainers filed in connection with sentencing. The court gave two reasons for its conclusion. First, the word "trial" includes sentencing for Sixth Amendment speedy trial purposes. *Walsh v. United States*, 423 F.2d 687, 688 (9th Cir. 1970). Second, the IAD provides that its provisions shall be given a broad construction to effectuate its purposes.

■ We do not find *Tinghitella* persuasive for several reasons.[2] First, its conclusion that the IAD applies to sentencing detainers is dicta. The case held that Tinghitella had neither an IAD nor a Sixth Amendment speedy trial right to be returned to California for sentencing because he had made no request to be sentenced; he had asked only to be returned to California. Since the IAD was not complied with, the court's conclusion that the IAD applies to sentencing detainers was of no consequence to the outcome of this case.

Second, an IAD case decided by the United States Supreme Court 2 years after *Tinghitella* calls the Ninth Circuit's reasoning and conclusion into question. In *Carchman v. Nash*, 473 U.S. 716, 87 L. Ed. 2d 516, 105 S. Ct. 3401 (1985), the Court held that the IAD does not apply to probation revocation proceedings. Justice Blackmun employed a plain meaning analysis, arguing that probation revocation is a post–trial proceeding and that the IAD refers only to "untried indictments, informations or complaints . . ." *Carchman*, at 725, 726.

In addition, legislative history indicated that Congress meant the IAD to apply to detainers filed in connection with "criminal charges" rather than post–conviction proceedings. Senator Hruska stated:

---

[2]While interpretation of the IAD is a matter of federal law, *Cuyler v. Adams*, 449 U.S. 433, 438–440, 66 L. Ed. 2d 641, 101 S. Ct. 703 (1981), this court is not bound by the interpretations placed on federal law by inferior federal courts. *Amalgamated Clothing Workers of Am. v. Richman Bros.*, 348 U.S. 511, 99 L. Ed. 600, 75 S. Ct. 452 (1955).

"At the heart of this measure is the proposition that a person should be entitled to have *criminal charges* pending against him determined in expeditious fashion." 116 Cong. Rec. 38840 (1970) (emphasis added).

473 U.S. at 729. The House and Senate reports contained similar language:

"A detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face *pending criminal charges* in another jurisdiction." H. R. Rep. No. 91–1018, p. 2 (1970); S. Rep. No. 91–1356, p. 2 (1970) (emphasis added).

(Some italics ours.) 473 U.S. at 729. In light of this language, Justice Blackmun concluded that the IAD did not apply to post–conviction proceedings. *Carchman,* at 726–29.

Finally, the *Carchman* Court pointed out that one of the main purposes of the IAD is to deter the filing of meritless detainers. If a detainer is lodged against a prisoner, that may well affect the quality of his treatment in the receiving state.[3] He may be denied parole or work release, for example. The IAD's speedy trial provision is designed to avoid this situation by permitting the prisoner to exonerate himself, if he can, of the charge in the receiving state. *Carchman,* at 729–34. This policy consideration is not present in probation revocation proceedings. Since this central purpose of the IAD would not be served, the Court held that the IAD did not apply to such proceedings.

The same reasoning applies here. Neither the history nor the purposes of the IAD indicate that it ought to be applied to sentencing detainers. A New Mexico appeals court has cited the logic and timing of *Carchman* in concluding that the IAD does not apply to sentencing detainers. *State v. Sparks,* 104 N.M. 62, 65, 716 P.2d 253 (Ct. App. 1986). We agree.

---

[3]The IAD defines "receiving state" as that state holding the prisoner and receiving a request from a sister state that it be notified when his release is imminent. The "sending state" is defined as the state wishing to be notified so that it may take custody of the prisoner.

*Sparks* also responds to *Tinghitella*'s argument that sentencing falls within the definition of trial for purposes of the Sixth Amendment. The opinion points out that: "the IAD provides that the defendant must be brought to trial within 180 days. The IAD, however, does not require that the case must be totally disposed of within 180 days." *Sparks,* at 65. In other words, if a *convicted* defendant is returned for sentencing on a detainer more than 180 days after his request, his trial has *commenced* within the time period, regardless of the fact that the trial is not complete until sentencing. The IAD cannot have been violated. Here too, the purposes of the IAD are not served by applying it to sentencing detainers.

### BAREFIELD HAS NOT BEEN PREJUDICED BY NONCOMPLIANCE WITH THE IAD

Even if the IAD did apply to Barefield's case, dismissal would not be called for because Barefield suffered no prejudice from Leavenworth's noncompliance with the IAD.

There is no dispute that Leavenworth officials did not inform Barefield of his right to request speedy disposition when Washington's detainer was filed, as the IAD ordinarily requires. Nor did they forward Barefield's May 1983 requests for speedy disposition to the Washington court and prosecutor, as the IAD ordinarily requires. Only after being informed of the *Tinghitella* decision did Leavenworth officials act in accord with the IAD, by providing Barefield with notice of his possible rights under the IAD and by forwarding his request for sentencing to Washington. While the 180–day time limit was met if calculated from the date of this latest request, that time period ordinarily would be calculated from the earlier dates.

However, even if the IAD applied here, dismissal would not be appropriate. While some cases call for dismissal where any omission results in the defendant's being tried *more than 180 days* after he requested or would have requested speedy disposition, *see Burns v. State,* 578

S.W.2d 650, 652 (Tenn. Crim. App. 1978), we decline to follow such a rule.

■ Recent cases from other jurisdictions establish the outlines of a case–by–case approach which we believe is preferable. The Supreme Court of Colorado has adopted a rule that dismissal will be granted only where the State fails to establish that there was a lack of prejudice to the defendant. *People v. Higinbotham,* 712 P.2d 993 (Colo. 1986); *Sweaney v. District Court,* 713 P.2d 914 (Colo. 1986). Other jurisdictions have indicated that they will not dismiss a case for violation of the IAD unless it can be shown that the officials acted in bad faith. In *People v. Bentley,* 121 Mich. App. 36, 328 N.W.2d 389 (1982) the court dismissed the indictment, but was careful to say that it was not adopting a general rule that dismissal was required in all cases where the IAD was not complied with. Instead, the court stressed the facts of the particular case.

> The prosecutor in this case made not the slightest effort to assure that defendant was informed of the detainer or of his right to request final disposition. After the filing of the detainer, the prosecutor took no action whatsoever under the IAD and simply allowed defendant to remain in the Hawaiian facility for eight months until his release and apprehension by bondsmen. The implication that the Midland [County, Michigan] authorities were kept well informed of defendant's status in Hawaii is unmistakable. Defendant's trial did not take place until eight months after his return to Michigan.

*Bentley,* at 45. *See also Coit v. State,* 440 So. 2d 409 (Fla. Dist. Ct. App. 1983).

Under a case–by–case approach, dismissal would not be warranted here. The Leavenworth officials construed the IAD not to apply to sentencing detainers. That is a reasonable construction, which we have adopted here. After they were informed of the *Tinghitella* decision, Leavenworth officials processed Barefield's request and he was set for sentencing in Washington within 180 days. Since the officials involved acted in good faith, no purpose would be

served by reversing the conviction and dismissing the information.

## The Admission of Blood Test Results Was Not Error

Former RCW 46.20.308(1) provided in part:

Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent . . . to a chemical test or tests of his breath or blood for the purpose of determining the alcoholic content of his blood . . . The test or tests shall be administered at the direction of a law enforcement officer . . . *Such officer shall inform the person of his right to refuse the test, and of his right to have additional tests administered by any qualified person of his choosing as provided in RCW 46.61.506.*

(Italics ours.) Laws of 1975, 1st Ex. Sess., ch. 287, § 4, p. 1225. The statute goes on to provide that persons under arrest for the crime of negligent homicide may be tested without their consent.

In *State v. Turpin,* 94 Wn.2d 820, 620 P.2d 990 (1980), the State argued that one under arrest for negligent homicide need not be informed of the right to alternative testing. We rejected that argument.

From the fact that the defendant cannot object to *State* testing it does not inexorably, or even logically, follow that the defendant must also be kept ignorant of his right to *independent* testing. The statute itself merely states that the State may administer its test without consent; it in no way implies that the right to independent testing or the right to be aware of independent testing is thereby lost.

*Turpin,* at 824. Because such a warning was not given in *Turpin,* we reversed and remanded for a new trial in which the results of the State's blood test would be excluded from evidence. Barefield argues that since the warning was not given in his case, the State's blood test should have been excluded from evidence in his trial. We disagree.

The record shows that Barefield was conscious only intermittently in the period during which further testing

would have yielded relevant evidence. When he was conscious, he was in shock and in extreme pain, and responded to questions from medical personnel with incoherent shouting. He testified that he has no memory of the period immediately after the accident, nor of anything else before he woke up in the hospital in September, 2 months after the accident. It is clear that Barefield was, for all intents and purposes, unconscious when the statutory warning would have been given. Had Barefield been advised of his right to independent testing he was in no condition to comprehend or exercise that right.

Under these circumstances, we conclude that giving the warning would have been a useless act. Given that fact, excluding the evidence at trial pursuant to *Turpin* was not necessary. This omission is not the sort of egregious violation of a suspect's rights which our exclusionary rule is designed to prevent. *See State v. Miles,* 29 Wn.2d 921, 933–34, 190 P.2d 740 (1948). We have previously indicated our support for a "useless act" exception to the exclusionary rule in the context of Washington's "knock and wait" statute, RCW 10.31.040. *State v. Coyle,* 95 Wn.2d 1, 621 P.2d 1256 (1980). *See State v. Lehman,* 40 Wn. App. 400, 698 P.2d 606, *review denied,* 104 Wn.2d 1009 (1985). We adopt a similar exception here. The admission of the State's blood alcohol test at trial was not error.

## CONCLUSION

The IAD does not apply to sentencing detainers. Dismissal of the information under article 5 of that statute is not required. The admission of the State's blood test at trial was not error.

We affirm petitioner's conviction for negligent homicide.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.