[No. 25395-6-I.   Division One.   August 5, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. FRANK M. CLARK III, *Appellant.*

*Paris K. Kallas* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Denis O'Leary, Deputy,* for respondent.

SCHOLFIELD, J. — Frank Clark appeals his conviction on one count of vehicular homicide, RCW 46.61.520. We affirm.

## FACTS

On December 21, 1988, Frank Clark was charged by information with one count of vehicular homicide under RCW 46.61.520. The charges arose from a February 15,

1988, accident in which Clark's vehicle collided with a vehicle driven by John Tierney, causing Tierney's death.

Within a half-hour of the accident, at 12:30 a.m. on February 15, a sample of Clark's blood was drawn as a part of the accident investigation. On February 16, Glen Case, a forensic toxicologist employed with the state toxicology lab, received two vacutainers[1] containing Clark's blood sample. Case performed two tests on one of the tubes on February 16, 1988, and analyzed the other tube on July 25, 1989; both tests were for the presence of ethyl alcohol concentration. The testing method used was gas chromatography.

Case testified that the vacutainers, as supplied by the manufacturer, contained two chemicals: sodium fluoride and potassium oxalate. Case stated that potassium oxalate is an anticoagulant, or a substance that maintains the sample as whole blood, thus preventing it from dividing into plasma and red blood cells. Sodium fluoride, Case testified, is both an anticoagulant and an antienzymatic compound that prevents enzyme activity on blood samples.

Case acknowledged that the state toxicology lab did not independently verify the chemicals contained in the vacutainers received from the manufacturer. When shown a letter from the manufacturer detailing the amount of sodium fluoride and potassium oxalate put in the vacutainers, Case stated that the amounts shown would be sufficient to prevent coagulation and preserve the alcohol in a sample that was drawn more than 30 days before testing. Case stated that, in his experience, a blood sample that contained neither an anticoagulant nor an enzymatic poison could be analyzed for up to 30 days without a change in alcohol concentration. When an anticoagulant and enzyme poison were contained in the sample, Case's studies indicated that a sample containing

---

[1]A "vacutainer" is a glass tube sealed with a stopper so that it is "under vacuum", or capable of drawing fluid directly through a needle once the stopper is pierced with the needle.

the chemicals could be analyzed for up to 1 year, and other literature placed the upper time limit at 6 years.

Clark moved to suppress the blood test results on two grounds. First, Clark argued that under RCW 46.61-.506(3), the state toxicologist was required to approve satisfactory blood testing techniques, and the regulations adopted by the toxicologist in WAC 448-14 neither approved of gas chromatography as a testing method nor set out adequate standards for its use. Second, Clark contended that the State had failed to show that the blood sample had been preserved with sufficient amounts of anticoagulant and enzyme poison, as required by WAC 448-14-020(3)(b), because the state toxicology lab did not verify the chemicals contained in the prepackaged vacutainers.

The trial court denied Clark's motion to suppress, entering findings of fact and conclusions of law. Clark has assigned error to the following factual findings:

4. WAC describes the criteria to be any test which meets the standards that the state toxicologist sets for himself.

5. The toxicologist has accepted Gas Chromatography as [a] test.

6. The Toxicologist has detailed standards.

7. The Gas Chromatography test does meet all the standards set by the Toxicologist.

8. The methods refereed [sic] to by RCW include a description of the nature of the test and the expectation that the legislature would have for those tests. This has been complied with.

9. The intent of RCW 46.61.506(3) is satisfied by the description of the test and the standards that the toxicologist would set for the administration of the tests.

10. RCW 46.61.50[6](3) did not intend to go so far into the laboratory as to require the toxicologist to publish the steps to be taken in the administration of the tests.

11. In this particular case a sufficient amount of anticoagulant and enzyme poison to comply with WAC 448.14.020 would be zero.

12. The consistency of the two tests administered on the blood sample and the letters form [sic] [the manufacturer] satisfy the court that there were sufficient amounts of anticoagulant and enzyme poison in the vacutainer vial.

Clark waived his right to a jury and the trial proceeded by stipulated evidence. After a review of the evidence, the court found Clark guilty of vehicular homicide. This appeal followed.

APPROVAL OF TESTING METHODS

Clark first argues that, although mandated to do so by RCW 46.61.506(3), the state toxicologist has failed to issue regulations approving the testing of blood by gas chromatography. Clark contends that because gas chromatography has not been approved, the result of any test using the method is inadmissible.

█ Under RCW 46.61.506(3), methods for blood alcohol testing must be approved by the state toxicologist. *State v. Schulze*, 116 Wn.2d 154, 167, 804 P.2d 566 (1991). Judicial review of the adequacy of the regulations is governed by the arbitrary and capricious standard. *Schulze*, at 167. RCW 46.61.506(3) provides as follows:

> Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 shall have been performed according to *methods approved by the state toxicologist* and by an individual possessing a valid permit issued by the state toxicologist for this purpose. The state toxicologist is *directed to approve satisfactory techniques or methods . . ..*

(Italics ours.) RCW 46.61.506(3), in part. To implement RCW 46.61.506(3), the state toxicologist promulgated WAC 448-14, which governs blood alcohol tests. *Schulze*, at 167. WAC 448-14-010 provides as follows in relevant part:

> Any quantitative blood alcohol analysis method which meets the following criteria *is approved by the state toxicologist* and may be used in the state of Washington. Analysis of urine for estimation of blood alcohol concentrations is not approved by the state toxicologist in the state of Washington.
> The blood analysis procedure should have the following capabilities:
> (1) Precision and accuracy.
> . . . .
> (b) *Except for gas chromatography*, the method should be calibrated with water solutions of ethyl alcohol, the strength

of which should be determined by an oxidimetric method which employs a primary standard, such as United States National Bureau of Standards potassium dichromate.

(Italics ours.) WAC 448-14-010.

■ The WAC does not contain regulations detailing approved testing methods, but rather, outlines the *criteria* any approved method must meet. *See* WAC 448-14-010. In *State v. Schulze, supra,* the court addressed whether the provisions of WAC 448-14-010, -020, and -030 were sufficiently specific to meet the requirements of RCW 46.61-.506(3):

> The regulations approve the tests only if they meet strict standards for precision, accuracy, and specificity. WAC 448-14-010. The regulations also specify the general manner in which tests must be conducted. WAC 448-14-010. WAC 448-14-020 sets forth analytical and reporting procedures for blood tests, and standards for sample containers and preservation. WAC 448-14-030 sets forth qualifications for blood alcohol analysts.

*Schulze,* at 167. Stating that a "cookbook detailing" of every step of the authorized procedure was not necessary, the court held that regulations set out in WAC 448-14 were sufficiently specific to meet the requirements of RCW 46.61.506(3). *Schulze,* at 166.

In this case, Clark contends that RCW 46.61.506(3) imposes a duty on the state toxicologist to promulgate regulations pertaining to gas chromatography, the testing method at issue here. However, in light of *Schulze* and its interpretation of WAC 448-14, Clark's claims must be rejected.

The court in *Schulze* explicitly held that WAC 448-14 complies with the requirements of RCW 46.61.506(3), and one of those requirements is the directive that the toxicologist "approve satisfactory techniques or methods, . . ." for analyzing blood. RCW 46.61.506(3). Implicit in the reasoning of *Schulze* is that WAC 448-14 is substantively sufficient, even though it does not contain a listing of regulations pertaining to specific testing methods. Therefore, "approval" of a method by the state toxicologist

under WAC 448-14 does not require the promulgation of regulations.[2]

■ The next question is whether substantial evidence supports the trial court's conclusion that the state toxicologist has approved of gas chromatography as a testing method. Glen Case testified that in his 17 years in the field of toxicology, he had tested nearly 20,000 blood samples for the presence of alcohol. He stated that the gas chromatography method was employed in "[b]asically all" of the tests. Case also testified that his office had a written protocol detailing the methods used for performing gas chromatography tests, and that it was "the method we use, . . .". Gas chromatography is the only testing method specifically mentioned in WAC 448-14,[3] and it has been given tacit approval by the courts of this state.[4] The trial court's conclusion that gas chromatography has been approved by the state toxicologist is supported by substantial evidence.

---

[2]Clark relies on cases from other jurisdictions which, on the basis of statutes similar to RCW 46.61.506(3), have held that regulations relating to blood testing methods must be promulgated before the test results can be admitted into evidence. *See, e.g., State v. Jones,* 316 So. 2d 100, 96 A.L.R.3d 735 (La. 1975) (State may not avail itself of presumption of intoxication arising from positive photoelectric intoximeter test until Health and Human Resources Administration establishes and promulgates carefully detailed methods, procedures, and techniques for use); *State v. Peters,* 729 S.W.2d 243 (Mo. Ct. App. 1987) (results of gas chromatography test inadmissible where Department of Health had not issued regulations approving technique). The *Jones* and *Peters* decisions are of limited persuasive weight in this case, however, since our Supreme Court in *Schulze* held that WAC 448-14 is sufficiently specific to comply with the requirements of RCW 46.61.506(3).

[3]WAC 448-14-010 specifically excludes analysis of urine as an approved method. The provision also details requirements applicable to testing methods "[e]xcept for gas chromatography, . . .". *See* WAC 448-14-010(1)(b).

[4]Gas chromatography was the testing method used in *State v. Curran,* 116 Wn.2d 174, 804 P.2d 558 (1991), a case consolidated for argument with *Schulze.* *See also State v. Weston,* 54 Wn. App. 105, 109, 772 P.2d 1036 (1989) (approving accuracy of gas chromatograph); *State v. Huynh,* 49 Wn. App. 192, 196, 742 P.2d 160 (1987) (provides detailed explanation of gas chromatography and states that it is acceptable to compare unaltered liquid gas samples for the purpose of determining its source), *review denied,* 109 Wn.2d 1024 (1988).

PRESERVATION OF BLOOD SAMPLE

■ Before blood alcohol test results can be admitted into evidence, the State must present prima facie proof that the test chemicals and the blood sample are free from any adulteration which could conceivably introduce error to the test results. *State v. Weston*, 54 Wn. App. 105, 108, 772 P.2d 1036 (1989); *State v. Barefield*, 47 Wn. App. 444, 458, 735 P.2d 1339 (1987), *aff'd*, 110 Wn.2d 728, 756 P.2d 731 (1988). WAC 448-14-020(3)(b) provides as follows:

> Blood samples for alcohol analysis shall be preserved with an anticoagulant and an enzyme poison sufficient in amount to prevent clotting and stabilize the alcohol concentration. Suitable preservatives and anticoagulants include the combination of sodium fluoride and potassium oxalate.

Clark has assigned error to the trial court's finding that, in this particular case, "a sufficient amount of anticoagulant and enzyme poison to comply with WAC 448-14-020 would be zero." Finding of fact 11. The court's finding appears to be based on two factors: (1) the evidence that the first blood sample from Clark was tested within a day of the accident, and (2) Case's testimony that blood could be safely tested without the chemicals for up to 30 days.

We agree with the trial court's determination. The obvious purpose of WAC 448-14-020(3)(b) is to ensure that the blood sample is properly preserved. The provision requires the use of chemical preservatives only insofar as there is a risk of clotting or loss of alcohol concentration in the sample. There is substantial evidence that neither risk existed in this case, however, because Clark's blood was tested within 1 day of the accident, and there was evidence that a sample could be safely tested without preservatives for up to 30 days.[5]

---

[5]Regarding the use of preservatives in blood samples, Case's testimony is consistent with that given by state toxicologists in other cases. *See State v. Barefield, supra* at 458 (state toxicologist testified that presence or absence of an anticoagulant would not affect test results); *State v. Steinbrunn*, 54 Wn. App. 506, 508, 774 P.2d 55 (evidence presented that additives are not necessary

■ In any event, the trial court ultimately found that the vacutainer vials contained a sufficient amount of anticoagulants and enzyme poison. In making this finding, the trial court relied on a letter from the vacutainer manufacturer detailing the amount of anticoagulants and enzyme poison contained in the vacutainers, as well as the fact that there had been no change in the blood test results in two different tests.[6]

On the basis of similar evidence, this court in *State v. Barefield*, *supra*, held that a proper foundation had been established for admitting a vial of blood into evidence. The state toxicologist in *Barefield* testified that the sample was not adulterated and that the vial manufacturer always put an anticoagulant in vials of that type. *Barefield*, at 458. The court also relied on company literature and the labeling on the vial, both of which indicated the presence of an anticoagulant. *Barefield*, at 458. *See also State v. Steinbrunn*, 54 Wn. App. 506, 512-13, 774 P.2d 55 (prima facie case established where nurse testified that vial was supplied by hospital, and toxicologist testified that vial manufacturer always put anticoagulants in such vials), *review denied*, 113 Wn.2d 1015 (1989).

The State in this case made a prima facie showing that Clark's blood sample was properly preserved. This being accomplished, it was for the trier of fact to determine the weight to attach to the evidence. *Steinbrunn*, at 513.

---

because lab can break down clotted blood; testing was performed soon enough after the samples were drawn that the blood would not have changed even without the preservative), *review denied*, 113 Wn.2d 1015 (1989). The evidence in *Steinbrunn* further indicated that any change due to a lack of preservative would result in a *lower* blood alcohol reading. *Steinbrunn*, at 508.

[6]The consistency of blood test results is particularly significant. As Case testified, a constant level of alcohol concentration in a blood sample can only be maintained for 30 days where no preservatives are used. Although the two tests here were administered nearly 1 1/2 years apart, the results were the same. This gives rise to a strong inference that the vacutainers contained an anticoagulant and enzyme poison.

Judgment affirmed.

COLEMAN and AGID, JJ., concur.