102 P.3d 192 (2004)
STATE of Washington, Respondent,
v.
William Frank HULTENSCHMIDT, Appellant.
No. 29209-2-II.
Court of Appeals of Washington, Division 2.
December 7, 2004.
As Amended January 11, 2005.
*193 Manek R. Mistry, Backlund & Mistry, Olympia, WA, for Appellant.
Jill Landes, Clallam County Prosecutors Office, Port Angeles, WA, for Respondent.
HOUGHTON, J.
William Hultenschmidt appeals his conviction of vehicular homicide, arguing that the trial court erred in admitting a blood sample analysis, excluding a computer-generated animation recreating the accident, and instructing the jury. We reverse and remand.

FACTS
Melvin Sanders' Buick LeSabre struck Hultenschmidt's Oldsmobile Cutlass Ciera on the passenger side. Hultenschmidt's passenger, Sandra Madera, died as a result of the accident.
Port Angeles Police Officer Tyler Peninger investigated the collision. When he arrived at the scene, Peninger could smell alcohol in the area where Hultenschmidt bent over Madera. Peninger spoke with Hultenschmidt who initially denied that he had been drinking, but later admitted that had consumed two to three vodka collins drinks.
Peninger took Hultenschmidt to Olympic Medical Center to draw blood for alcohol concentration analysis. A technician drew two gray-topped tubes of blood, sealed them *194 with green tape, and gave the tubes to Peninger. Peninger took the tubes to the police department and packaged them for shipment to the Washington State Patrol Crime Laboratory (crime lab).
After the crime lab analysis revealed a 0.19 blood alcohol content,[1] the State charged Hultenschmidt with vehicular homicide[2] and vehicular assault.[3] A jury heard the matter.
A trial, Estuardo Miranda, a crime lab toxicologist, testified about the blood sample evidence and crime lab procedure. Miranda set forth his qualifications, training, education and experience and responded, "Yes," when asked if he had "any permits issued by the State toxicologist." Report of Proceedings (RP) (May 13, 2002) at 105.
Miranda explained that he signed for and opened the box containing Hultenschmidt's blood samples. The box held two gray-topped tubes with intact seals. According to the verbatim report of trial proceedings, Miranda testified that laboratory protocol "suggests" that samples contain "anticoagulant in a preservative, sodium chloride [sic] or potoxinoxolate [sic]"[4] and that the "tubes that contain those chemicals to preserve the blood are characterized by having a gray top and that's what seals the tube." RP (May 13, 2002) at 107. He further testified that sealed gray-topped blood sample tubes contain those chemicals.
When asked about how blood samples are preserved, he explained that "[w]e suggest that they are  that we receive samples containing anticoagulant in a preservative, sodium chloride [sic] or potoxinoxolate [sic]. The tubes that contain those chemicals to preserve the blood are characterized by having a gray top and that's what seals the tube." RP (May 13, 2002) at 107. Miranda testified that "potoxinoxolate [sic] and sodium chloride [sic]" are common anticoagulants. RP (May 13, 2002) at 107. In response to the State asking whether an enzyme poison is required to take a blood sample from a human being for blood alcohol analysis, he replied, "[i]t is not required." RP (May 13, 2002) at 108. The State asked Miranda if "anything else other than an anticoagulant [is] needed to preserve the ethicacy [sic] of a blood sample?" RP (May 13, 2002) at 108. Miranda responded, "no." RP (May 13, 2002) at 108. Finally, Miranda testified that the sample had not coagulated when he received it.
Defense counsel asked to voir dire Miranda. Because no question was before the witness, the trial court denied the motion. Defense counsel objected to introducing the blood test results based on lack of foundation. He argued that the crime lab failed to follow proper sample preservation procedures and Miranda did not have a proper state toxicology permit. The court overruled the objection, stating that the objection went to weight of the evidence not to its admissibility.
Also at trial, Hultenschmidt sought to introduce a computer-generated animation through his accident reconstruction expert. The expert prepared a video animation comprising six segments, three depicting the collision with the Sanders vehicle traveling its actual speed, and three depicting the accident with the Sanders vehicle traveling the 25 mph posted speed limit instead of 47.5 mph.[5] The animations showed that when Sanders' vehicle traveled at 25 mph, the accident would not have occurred.
The court ruled that the three segments depicting the Sanders vehicle traveling 25 mph lacked foundation and were not admissible. *195 For the same reason, the court refused to allow Hultenschmidt's expert to testify that the collision would not have occurred had Sanders been observing the posted speed limit.
The jury convicted Hultenschmidt of vehicular homicide and he appeals.

ANALYSIS

Blood Alcohol Sample
Hultenschmidt first contends that the trial court erred in admitting the blood test results because the State failed to present a prima facie case that the blood sample lab analysis complied with statutory and regulatory provisions. Hultenschmidt raises several evidentiary arguments regarding his blood sample preservation, all stemming from this same premise: that the State failed to show that the blood test conformed with WAC 448-14-020(3)(a) and (b).
Specifically, Hultenschmidt argues that the court should not have admitted the blood test results because the State made no showing that: enzyme poison was present in his blood sample; his blood sample was placed in a chemically clean and dry container; his sample was immediately and appropriately sealed with an inert and leak-proof stopper; or the toxicologist possessed a valid permit for performing blood alcohol tests.
We review a trial court's evidentiary rulings for abuse of discretion. State v. Stubsjoen, 48 Wash.App. 139, 147, 738 P.2d 306, review denied, 108 Wash.2d 1033 (1987). A court abuses its discretion when it exercises it on untenable grounds or for untenable reasons. State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971).
Our analysis involves interpreting the interplay among various statutes and regulations concerning driving under the influence of intoxicating liquor or drugs and vehicular homicide. RCW 46.61.520(1)(a). Here, the jury convicted Hultenschmidt under the vehicular homicide statute, which provides that:
[T]he driver is guilty of vehicular homicide if the driver was operating a motor vehicle: (a) While under the influence of intoxicating liquor or any drug as defined by RCW 46.61.502.
RCW 46.61.520(1).
The vehicular homicide statute refers us to RCW 46.61.502, which provides that:
(1) A person is guilty of driving while under the influence of intoxicating liquor or any drug if the person drives a vehicle within this state:
(a) And the person has, within two hours after driving, an alcohol concentration of 0.08 or higher as shown by analysis of the person's breath or blood made under RCW 46.61.506; or
(b) While the person is under the influence of or affected by intoxicating liquor or any drug; or
(c) While the person is under the combined influence of or affected by intoxicating liquor and any drug.
RCW 46.61.502(1)(a) in turn refers us to RCW 46.61.506, which prescribes blood sample testing:
(3) Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose. The state toxicologist is directed to approve satisfactory techniques or methods, to supervise the examination of individuals to ascertain their qualifications and competence to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the state toxicologist.
Finally, RCW 46.61.506(3) enables the state toxicologist to promulgate regulations for proper blood sample analysis. The Washington Administrative Code (WAC) requires that blood samples be kept in a clean, dry, sealed container and preserved by a stabilizing anticoagulant and enzyme poison. WAC 448-14-020(3)(a) and (b). The sample must be analyzed by a validly licensed technician. RCW 46.61.506.
*196 Hultenschmidt asserts that the trial court should have excluded the results of his blood sample analysis because the State did not prove the elements of WAC 448-14-020(3)(a) and (b) and RCW 46.61.506. It is well established that a blood sample analysis is admissible to show intoxication under RCW 46.61.502 only when it is performed according to WAC requirements. State v. Bosio, 107 Wash.App. 462, 466-67, 27 P.3d 636 (2001).
In Bosio, the court held that blood alcohol test results could not be admitted into evidence unless the State presented prima facie proof that the test chemicals and blood sample are "free from any adulteration which could conceivably introduce error to the test results." The court elaborated:
The purpose of requiring the use of anticoagulants and enzyme poison in the blood sample is to prevent clotting or a loss of alcohol concentration in the sample.
The regulations promulgated by the state toxicologist for analyzing blood do not specify the approved testing methods, "but rather, outlines the criteria any approved method must meet." "The regulations approve the tests only if they meet strict standards for precision, accuracy, and specificity." These uniform procedures help ensure that the test results will be accurate and reliable.
Bosio, 107 Wash.App. at 466-67, 27 P.3d 636 (citations omitted). The court reversed Bosio's conviction of vehicular assault and remanded for a new trial because the trial court improperly admitted the blood test results when the State did not present evidence that an enzyme poison was added to the blood sample. Bosio, 107 Wash.App. at 468, 27 P.3d 636. Likewise, in State v. Garrett, the court vacated a conviction of driving under the influence because the trial court admitted the results of the blood test when the State did not present evidence that an anticoagulant had been added to the blood sample. 80 Wash.App. 651, 654, 910 P.2d 552 (1996).
Here, the State counters that it proved that the gray-topped tubes satisfied the "administrative regulations." Respondent's Brief at 13. But the State fails to mention the requirement of an enzyme poison in the tube. The State argues that it established a prima facie case that the samples were free from adulteration that could introduce error into the test results. But again, the State does not address the lack of an enzyme poison.
Here, Miranda testified that the gray-topped tubes arrived with intact seals:
Q: How are blood samples preserved?
A: We suggest that they are  that we receive samples containing anticoagulant in a preservative, sodium chloride [sic]or potoxinoxolate [sic]. The tubes that contain those chemicals to preserve the blood are characterized by having a gray top and that's what seals the tube.
Q: What are the common forms of anticoagulants?
A: The potoxinoxolate [sic] and sodium chloride [sic] are both anticoagulants.
Q: To the lay person what would they look like if you saw them?
A: They would look like salt, just a little powder. If you had a little bit of one of the other, it would be hard to distinguish them.
Q: When you say like salt, what color would that be?
A: In a white color.
Q: Is any enzyme poison required to take a blood sample taken from a human being?
A: It is not required.
Q: Is there anything else other than an anticoagulant needed to preserve the ethicacy [sic] of a blood sample?
A: No.
....
Q: Was the blood coagulated in the tubes?
A: No, it was not.
Q: How does it stay not coagulated in the tubes?
A: Usually the anticoagulant prevents coagulation of the sample, and the way we can tell is when blood clots it forms various forms inside the tube. You can easily see  it's like it's formed to the cylinder, the blood. When it's in a liquid form you *197 can move it around and you could see it moves easily.
Q: How did this particular sample arrive?
A: It was not coagulated.
Q: Were you able to move it around easily?
A: Yes, I was.
Q: Did that tell you anything?
A: That it wasn't coagulated.
RP (May 13, 2002) at 107-09.
The State did not ask Miranda any additional questions about enzyme poisons. The State offered no evidence of an enzyme poison present in the blood sample. Thus, the State did not demonstrate that the blood test complied with WAC 448-14-020(3)(a) and (b). Accordingly, the blood test sample was inadmissible under Bosio.[6] The remedy is to remand for a new trial. Because we remand, we address Hultenschmidt's remaining arguments likely to arise on retrial.

Accident Reconstruction Demonstration
Hultenschmidt further contends that the trial court violated his constitutional right to present a defense by excluding an animation that would have shown that, had the other vehicle slowed to the speed limit just six seconds before the accident, the collision would not have occurred.
A trial court may admit demonstrative evidence when the experimental conditions are substantially similar to the facts of the case. State v. Finch, 137 Wash.2d 792, 816, 975 P.2d 967, cert. denied, 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999). If substantially similar, then demonstrative evidence such as photographs and videotapes may be admitted when their probative value outweighs their prejudicial effect. State v. Rogers, 70 Wash.App. 626, 633, 855 P.2d 294 (1993), review denied, 123 Wash.2d 1004, 868 P.2d 872 (1994).
Hultenschmidt wanted to show the jury an animated reconstruction videotape demonstrating that the accident would not have occurred had the other driver obeyed the 25 mph speed limit. The court excluded the animations showing the other car traveling 25 mph and avoiding the collision.[7] In ruling, the court explained:
That [referencing the animations with the other car traveling at 25 mph] is confusing and not helpful to the jury. I looked at that very carefully and am certainly familiar with what you can show.... I think that's allowed as long as it's illustrative, and as long as the facts which are assumed are facts within this expert's expertise and based on some reasonable assumption. The second set of video assumes something that did not occur and would be irrelevant to this, and is confusing to me and unduly confusing to the jury.
RP (May 14, 2002) at 117. The court also explained:
You can't put the second car a block away at 25 miles an hour. You might as well put it ten blocks away. You could show the same video having Mr. Hultenschmidt stay home. He wouldn't have been there and there wouldn't have been a collision. There's no foundation, nor can there be a foundation to put the Sanders vehicle a block away and have it do 25 miles an hour. You can't lay that foundation. It's a fact that could never be put in evidence. The other is this expert's opinion as to what did happen based on foundational testimony and scuff mark skids and calculations, so that [can] come in. You can't have an expert witness testify as to a hypothetical where there's no possible way *198 of providing a single fact of that hypothetical.
RP (May 14, 2002) at 115.
The trial court considered the similarity between the recreated and actual events and concluded that there was insufficient similarity to justify their admission. The trial court did not abuse its discretion in excluding the evidence.

Jury Instructions
Hultenschmidt finally contends that the blood testing methodology set out in RCW 46.61.506 is an essential element of vehicular homicide and that the trial court erred by not instructing the jury on this element. Because Hultenschmidt could have proposed such an instruction, but did not, he waived this argument on appeal. State v. Hickman, 135 Wash.2d 97, 102-03, 954 P.2d 900 (1998).
Reversed and remanded.
I concur: SEINFELD, J.
QUINN-BRINTNALL, C.J. (dissenting).
The majority reverses the jury's verdict on the grounds that the State failed to comply with WAC 448-14-020(3) and therefore failed to establish the integrity of Hultenschmidt's blood sample and the reliability of the blood alcohol level results. Because I believe that the majority applies a standard higher than the proper prima facie standard in its review of the foundation for admissibility of the blood sample evidence and because the alleged deficiency could have only benefited Hultenschmidt, I respectfully dissent.
Blood tests are admissible in a driving under the influence or vehicular homicide trial if the offering party makes a prima facie showing that the blood sample was free of any adulteration and that the test results were without error. State v. Clark, 62 Wash.App. 263, 270, 814 P.2d 222 (1991). To that end, the offering party must lay the following statutorily mandated foundation: (1) the test was performed according to methods approved by the state toxicologist; (2) the test was performed by an individual possessing a valid permit issued by the state toxicologist; (3) the blood sample was stored in a chemically clean, dry, and sealed container; and (4) the blood sample was "preserved with an anticoagulant and an enzyme poison sufficient in amount to prevent clotting and stabilize the alcohol concentration." WAC 448-14-020(3)(a); see also RCW 46.61.506(3). Under WAC 448-14-020(3)(b), "[s]uitable preservatives and anticoagulants include the combination of sodium fluoride and potassium oxalate." Once prima facie evidence of these requirements has been presented, the test results are admissible and any other concerns about the blood or the test go solely to the weight given the results. State v. Steinbrunn, 54 Wash.App. 506, 513, 774 P.2d 55, review denied, 113 Wash.2d 1015, 779 P.2d 731 (1989).
Here, Officer Peninger obtained sealed, gray-topped blood draw tubes provided by the Washington State Patrol for use in drawing a suspect's blood. Peninger took Hultenschmidt and the sealed tubes to the Olympic Medical Center where Shelly Ley, a qualified laboratory assistant, drew Hultenschmidt's blood into the gray-topped tubes. Ley saw white powder in the tube before she drew the blood. After she drew the blood from Hultenschmidt, Ley placed her initials and the time of the blood draw on the tubes and returned them to their styrofoam shipping container. The container was then sealed and sent to the state crime lab for processing. At the lab, Estuardo Miranda received the container, tested Hultenschmidt's blood sample for alcohol using gas chromatography, a method approved by the state toxicologist. The test showed that Hultenschmidt had a blood alcohol level of .19.
It is clear that Hultenschmidt's blood was analyzed by a qualified crime lab toxicologist, using a method approved by the state, and that the blood was stored in chemically clean, dry, and sealed tubes. Miranda also testified that the white powder which Ley saw was sodium fluoride and potassium oxalate, chemicals contained in all sealed, gray-topped blood draw tubes provided to law enforcement. WAC 448-14-020(3)(b) provides that these chemicals are "[s]uitable preservatives and anticoagulants." But the majority reverses Hultenschmidt's conviction because Miranda did not specifically testify to the *199 presence in the gray-topped tube of what he considered to be an unnecessary enzyme poison.
In my opinion the record before us sufficiently establishes a prima facie case that Hultenschmidt's blood sample was taken in sealed, gray-topped blood draw tubes provided by the state toxicologist for this use. These tubes are provided already containing the chemicals required by the state toxicologist. The evidence provided by the State provided a prima facie showing that the tube used was sufficiently free of adulteration for the trial court to admit the evidence of Hultenschmidt's blood alcohol level. See, e.g., Steinbrunn, 54 Wash.App. 506, 774 P.2d 55 (state established prima facie that tube used to collect blood unadulterated even though tube used to collect sample was supplied by Oregon hospital); State v. Barefield, 47 Wash.App. 444, 458, 735 P.2d 1339 (1987) (blood test admissible where state toxicologist testified that the manufacturer always puts anticoagulants in this type (gray-topped) vials although in witnesses' opinion the presence or absence of the anticoagulant would not affect the test), aff'd, 110 Wash.2d 728, 756 P.2d 731 (1988).
The majority opinion relies on two cases from Division Three of this court, State v. Bosio, 107 Wash.App. 462, 466-67, 27 P.3d 636 (2001), and State v. Garrett, 80 Wash.App. 651, 654, 910 P.2d 552 (1996). Bosio relied on Garrett and held that the absence of specific testimony that enzyme poisons were present was fatal to the reliability of the blood alcohol evidence and required its exclusion. But in my view both the majority here and the Bosio court reads Garrett too broadly. In Garrett, it was undisputed that the vial did not contain an anticoagulant. In Bosio, there was evidence that the tubes contained an anticoagulant, the blood was not coagulated, but no express testimony that the gray-topped tubes also contained an enzyme poison. In contrast, here, Miranda testified that the gray-topped tubes contained sodium fluoride and potassium oxalate and WAC 448-14-020(3)(b) provides that these are sufficient "preservatives and anticoagulants" to insure reliability of the blood tests.
A prima facie case having been made, it was for the jury to determine the weight to attach to the blood alcohol level evidence. Steinbrunn, 54 Wash.App. at 513, 774 P.2d 55 (citing Hoffman v. Tracy, 67 Wash.2d 31, 35, 406 P.2d 323 (1965)).
Moreover, even if the record were insufficient to find that enzyme poisons were in the tube containing Hultenschmidt's blood sample, there would be no logical or statutory reason to exclude the test results on Hultenschmidt's request. "The obvious purpose of WAC 448-14-020(3)(b) is to ensure that the blood sample is properly preserved. The provision requires the use of chemical preservatives only insofar as there is a risk of clotting or loss of alcohol concentration in the sample." Clark, 62 Wash.App. at 270, 814 P.2d 222 (emphasis added). Here, Miranda testified that, in his expert opinion, enzyme poisons are unnecessary. Miranda's testimony is consistent with that given by state toxicologists in other cases where the blood tests have been deemed admissible. See Clark, 62 Wash.App. at 270, 814 P.2d 222 (toxicologist testified that blood sample containing neither an anticoagulant nor an enzymatic poison could be analyzed for up to 30 days without a change in alcohol concentration); Steinbrunn, 54 Wash.App. at 508, 774 P.2d 55 (evidence presented that additives are not necessary because lab can break down clotted blood; testing was performed soon enough after the samples were drawn that the blood would not have changed even without the preservative); Barefield, 47 Wash.App. at 458, 735 P.2d 1339 (toxicologist testified that absence of an anticoagulant would not affect test results). As the Bosio court itself noted, the purpose of an enzyme poison is to prevent a loss of alcohol concentration in the blood. 107 Wash.App. at 466-67, 27 P.3d 636; accord Clark, 62 Wash.App. at 270, 814 P.2d 222; Steinbrunn, 54 Wash.App. at 508, 774 P.2d 55. Such loss would result in an inaccurately lower blood alcohol reading. Thus, even assuming the lack of an enzyme poison, such lack serves only to benefit the defendant by allowing the evaporation of the alcohol in the sample and lowering the reading. No error *200 prejudicing Hultenschmidt occurred in this case and I would not reverse the jury's verdict finding Hultenschmidt guilty of vehicular homicide on the possible grounds that the State's evidence may have demonstrated a blood alcohol level lower than that which Hultenschmidt actually had on the night of his offense. Therefore, I respectfully dissent.
NOTES
[1] RCW 46.61.502(1)(a) establishes a presumption of intoxication when a person's blood contains an alcohol concentration of 0.08 or higher. At trial, Hultenschmidt denied being intoxicated. He explained that accident trauma heightened his adrenaline level, causing the alcohol he consumed to be absorbed into his bloodstream at a faster than normal rate.
[2] RCW 46.61.520.
[3] RCW 46.61.522. The trial court later dismissed the vehicular assault charge.
[4] We assume that Miranda testified about sodium fluoride and potassium oxalate, rather than the apparently mis-transcribed "potoxinoxolate and sodium chloride."
[5] The expert testified that at the time of the accident, Hultenschmidt was traveling "about 11 miles an hour" and that Sanders was traveling about 47.5 mph. RP (May 14, 2002) at 101.
[6] Because we reverse and remand based on the State's failure to show the presence of an enzyme poison, we do not address Hultenschmidt's arguments that the State also failed to show that his blood sample was placed in a chemically clean and dry container, that his sample was immediately and appropriately sealed with an inert and leak-proof stopper, and that it was analyzed by a toxicologist who possessed a valid permit for performing blood alcohol tests. We note that the requirements of WAC 448-14-020(3)(a) and (b) must be met before a blood test result may be introduced into evidence to show intoxication.
[7] The court allowed Hultenschmidt to present the first three animations that showed the other car traveling at its actual speed of 47.5 mph.