[No. 55872-2-I. Division One. August 21, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. SANDRA L. WILBUR-BOBB, *Appellant*.

628

*David B. Koch* and *Christopher Gibson* (of *Nielsen, Broman & Koch, P.L.L.C.*), for appellant.

*Thomas E. Seguine, Prosecuting Attorney*, for respondent.

¶1 BECKER, J. — Convicted of vehicular homicide, Sandra Wilbur-Bobb contends the trial court should not have admitted her blood alcohol test results to prove her level of intoxication. To gain admission of blood test results at trial, the State must make a prima facie case that the blood sample tested was preserved with an enzyme poison such as sodium fluoride. In this case, a photograph of the vials containing the blood sample shows the vials were labeled as containing sodium fluoride. Along with testimony by the officer and toxicologist establishing the chain of custody, this was sufficient to make a prima facie case.

## FACTS

¶2 On a Saturday night in August 2003, Wilbur-Bobb was drinking at a bar for two hours. Before 2 AM, she went from the bar to a party. There, she and three friends decided to go "four wheeling." They took her Jeep out for a few hours, discovered one of the tires was low on air, and drove to a nearby gas station to fill it. It was approximately 5:30 AM when they decided to drive back to the four wheeling area. On the way back, Wilbur-Bobb drove the Jeep off a narrow road at 15-20 miles per hour. The Jeep rolled upside down into waist-deep swamp water. One of her passengers drowned as a result of the accident.

¶3 The State charged Wilbur-Bobb with one count of vehicular homicide. The case came on for a jury trial in January 2005. The primary factual dispute was whether Wilbur-Bobb was intoxicated while she drove. The State presented evidence concerning a blood sample taken from Wilbur-Bobb at 9:41 AM on Sunday. Toxicologist Estuardo Miranda, who analyzed the blood sample less than one week later, found that Wilbur-Bobb's blood alcohol content when drawn was 0.05. Applying the theory of "retrograde extrapolation" to that result, Miranda estimated that Wilbur-Bobb's blood alcohol content was between 0.092 and 0.156 at the time of the accident. Miranda testified that at an alcohol level of 0.08 all individuals are impaired to such a degree that it is not safe for them to drive.

¶4 Several law enforcement witnesses testified to various signs of Wilbur-Bobb's intoxication they observed when responding to the accident. An officer testified that Wilbur-Bobb admitted to him that morning that she had six alcoholic drinks at the bar and that she believed her ability to drive had been affected by her intoxication. Wilbur-Bobb's passengers testified that, although they were intoxicated, they did not believe Wilbur-Bobb had been intoxicated. Wilbur-Bobb did not testify.

¶5 The jury convicted Wilbur-Bobb of vehicular homicide. The trial court sentenced her to 31 months in prison. Wilbur-Bobb appeals. She contends the trial court erred by admitting her blood test results and by allowing Miranda to testify about his application of retrograde extrapolation to those results.

## BLOOD TEST RESULTS

¶6 Before blood alcohol test results can be admitted into evidence, the State must present prima facie proof that the test chemicals and the blood sample are free from adulteration that could conceivably introduce error to the test results. *State v. Clark*, 62 Wn. App. 263, 270, 814 P.2d 222 (1991). For purposes of proof, a valid blood test is one performed according to methods approved by the state toxicologist. RCW 46.61.506(3). A regulation promulgated by the state toxicologist requires the use of an enzyme poison to preserve the blood sample for analysis:

> Blood samples for alcohol analysis shall be preserved with an anticoagulant and an enzyme poison sufficient in amount to prevent clotting and stabilize the alcohol concentration. Suitable preservatives and anticoagulants include the combination of sodium fluoride and potassium oxalate.

WAC 448-14-020(3)(b). Miranda testified at trial that sodium fluoride is the enzyme poison. He testified that its purpose is to prevent the creation or elimination of alcohol in the sample between the time the sample is taken and the time it is tested.

■ ¶7 Wilbur-Bobb contends that the State failed to prove that the vials used to collect her blood contained sodium fluoride. We find the proof sufficient.

¶8 A trooper testified that Wilbur-Bobb's blood was tested with a blood vial packet from his patrol car. The packet contained two gray-top vials. Troopers are required to use these gray-top vials for the collection of blood. The vials come from the State toxicology lab, contain a white powder, and are labeled with expiration dates.

¶9 Miranda brought to the trial a photograph of the actual vials in which the blood sample was preserved.[1] The trial judge looked at the photograph and stated that the vials used were labeled as containing "sodium fluoride."

¶10 The writing on the label is partially covered by another label. Wilbur-Bobb contends the words "sodium fluoride" are simply not there to be seen. We have looked at the same color photograph the judge was looking at. We have compared it to a black and white copy of the photograph. The black and white copy does not clearly show the words "sodium fluoride." But exhibit 21, the actual color photograph examined by the trial judge, does clearly contain those words. We conclude the judge accurately described the label on the vial.

¶11 This court has decided two cases in which the enzyme poison evidence was held to be insufficient: *State v. Bosio*, 107 Wn. App. 462, 467-68, 27 P.3d 636 (2001), and *State v. Hultenschmidt*, 125 Wn. App. 259, 267, 102 P.3d 192 (2004). In *Bosio*, while there was evidence gray-topped vials were used, there was no evidence that those vials contained an enzyme poison. In *Hultenschmidt*, while there was testimony that the gray-topped vials contained sodium fluoride, there was no testimony that sodium fluoride was an enzyme poison. Here, Miranda testified that sodium fluoride is an enzyme poison. The labels on the vials showed that they contained sodium fluoride. No more is

---

[1] Ex. 21.

necessary. The trial court properly admitted the blood test results.

## RETROGRADE EXTRAPOLATION

¶12 Wilbur-Bobb contends Miranda's testimony about retrograde extrapolation did not meet the *Frye*[2] standard of general scientific acceptance.

¶13 Judges do not have the expertise required to decide whether a challenged scientific theory is correct. Therefore, expert testimony based on new scientific theories is admissible only if it is generally accepted in the relevant scientific community. If there is a significant dispute between qualified experts as to the validity of scientific evidence, that evidence may not be admitted. *State v. Copeland*, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996). If the *Frye* test is satisfied, the trial court must also determine under ER 702 whether the expert's testimony would be helpful to the trier of fact. *Copeland*, 130 Wn.2d at 256.

¶14 The State responds that the *Frye* issue is not preserved for appeal. *See State v. Jones*, 71 Wn. App. 798, 821, 863 P.2d 85 (1993) (*Frye* objection to generalized profile testimony about child abuse victims "should have been made at trial"). *See also State v. Newbern*, 95 Wn. App. 277, 289, 975 P.2d 1041 (1999) (declining to review *Frye* claim on appeal because the defendant "did not invoke *Frye* or otherwise argue that the evidence was not accepted within the scientific community").

¶15 Before the topic of retrograde extrapolation arose at trial, Miranda briefly outlined his qualifications as a toxicologist. He then began to explain how alcohol is absorbed into and eliminated from the human body. He testified that retrograde extrapolation is a mathematical formula for estimating a person's pretest blood alcohol concentration given that person's later verified blood alcohol concentration. According to Miranda, the formula is generally ac-

---

[2] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013, 1014 (1923).

cepted by scientists in his field "when it's used properly and the assumptions are made."[3]

¶16 When the prosecutor asked Miranda what assumptions needed to be made to accurately apply the formula, Wilbur-Bobb raised an objection as to foundation: "This is the toxicologist that measures, is certified to measure the amount of alcohol in a sample of blood that is provided to him."[4] The court sustained the objection, and the prosecutor asked several more questions about Miranda's training with respect to retrograde extrapolation. When the prosecutor asked the court whether this was sufficient foundation, Wilbur-Bobb again objected:

> He's read articles. I can read articles as to what to testify to as a toxicologist. He said he has two days total of training in this area. I don't have any information or any indication that this is scientifically accepted. We don't have any model or any information as to that. We don't know what specific articles he's read.
>
> . . . .
>
> . . . I continue my objection as to foundation.[5]

The court overruled the objection. The court treated the objection as going solely to Miranda's qualifications:

> I believe his research, his training, his degree, both educational and through his experience and background, and the fact that he's testified approximately 15 times in other courts on the same subject, probably qualifies him to do the same thing here, so I will allow him to so testify.[6]

¶17 In arguing that her objections preserved a *Frye* issue for appeal, Wilbur-Bobb relies on *State v. Black*, 109 Wn.2d 336, 341, 745 P.2d 12 (1987). In *Black*, a defendant raised objections to expert testimony regarding evidence of rape trauma syndrome. The defendant asked several questions

---

[3] Report of Proceedings at 236.

[4] Report of Proceedings at 237.

[5] Report of Proceedings at 239-40.

[6] Report of Proceedings at 240.

of the expert designed to show that the trauma symptoms in question were not unique to rape. This was held sufficient to preserve a *Frye* claim because the questions were "adequate to apprise the trial court of his objection to the use of rape trauma syndrome as a fact-finding method in a rape case." *Black*, 109 Wn.2d at 340.

¶18 *Black* confirms the general rule that evidentiary error is unpreserved unless a timely objection or motion to strike is made that states the specific ground of objection. *Black*, 109 Wn.2d at 340; ER 103. The reversal in *Black* illustrates the exception to that rule, namely, that failing to state the specific ground of an objection is not fatal when the specific ground is apparent from the context.

¶19 In context, Wilbur-Bobb did not contest the proposition that retrograde extrapolation is generally accepted in the relevant scientific community. She did not request a hearing on that issue, nor did she ask the court to clarify whether or not its ruling was intended to encompass that issue.

¶20 Retrograde extrapolation, unlike the rape trauma syndrome offered in *Black*, is a familiar forensic technique used routinely in our trial courts. The trial court would not have been expecting a *Frye* challenge. It is similarly unlikely that trial counsel actually intended to raise a *Frye* issue. In context, the objection went to Miranda's foundation for testifying as an expert.

¶21 The objection did not apprise the court of a challenge to the use of retrograde extrapolation as a fact-finding method in a case involving intoxication. We will not allow an objection to credentials to be transformed into a *Frye* argument on appeal. The trial court made a correct ruling on the only objection that was raised. We find no error in admitting the testimony about retrograde extrapolation.

¶22 Affirmed.

BAKER and DWYER, JJ., concur.